By the Court,

Harrington, Chief Justice:

The propounders of the will are to prove the factum ; and then the reviewers having the burden of attacking it, would have the opening and conclusion. Such has been the uniform practice. But proof of the factum is not necessarily confined to the subscribing witnesses of the instrument, or a will could not be proved at all, if they should ignore their signatures, or impeach the validity of it. Any other witness, however, called for such purpose, must be confined in his evidence to the execution of it merely. To go beyond this in the present instance, at this stage of the case, when the will is prima facie proved, is unnecessary, and would be but to anticipate and meet objections yet to be made to it.
Mr. D. M. Bates, objected to the admissibility of Mr. Rogers as a competent witness for any purpose, on the ground of interest in the event of the suit:
First, because he holds at present a pecuniary office of profit and emolument under the will, which he will retain o'r lose by the result of this case; namely, the office of executor. *59 This was the distinction between the office of executor in this country and in England. In England it is not an office of emolument. In that country unless the executor takes a beneficial interest under the will, as a legacy for instance, without which he there takes or derives no ben-. efit from it, he is competent. But in that country, if he takes a beneficial interest under the will, he is not a competent witness in favor of the will, unless it bq in case of a question, or contest between heir and devisee, which relates to the realty; and in which case, he admitted, he was a competent witness for the will, because, the legacy being payable out of the personal estate, he has, as executor and legatee, no interest or concern in regard to the real estate. Besides, under their practice the executor receives no commissions for administering the estate, and unless he takes a legacy under the will, he takes no pecuniary or beneficial interest under it. ° But in this country the practice is different. Here he always receives commissions, and it had been decided that he was not for this reason competent. 16 Barb. R. 198; Burret v. Sillman; Anderson et al. v. Nepp, 11 Serg. & Rawle, 208; Gephart v. Gephart, 15 Serg. & Rawle, 235; Tucker v. Tucker, 5 Iredell, 161; Taylor v. Taylor, 1 Richardson’s R. 531. In ,all these cases the executor was excluded as a witness for the will, on the ground that he was entitled to commissions, and held an office of profit and emolument under the will.
Secondly, on the ground that he takes a direct interest under the will in the estate, by reason of the compensation provided for him in the will as the trustee. A trustee by law is entitled to no compensation, unless by specific directions in the will. Willis on Trustees, m. p. 139, 10 Law Libr.; Green v. Winter, 1 Johns C. R. 27; State v. Platt, 4 Harr. 165. It matters not what you call the gift or bequest in this case, whether you call it a legacy, commissions, or anything else, it is the same, and creates and confers -a beneficial interest under the will. In the case of a simple or naked trustee without compensation, who merely holds for the use and benefit of another, and sub *60 ject to Ms order and disposition of the estate, he is competent ; but a special trustee is not, because the first has no interest in the estate, whilst the latter has an interest in it. Will. on Trustees, 228; Allison v. Allison, 1 Hawks’ R.
And thirdly, on the ground that the executor is a party to this cause, and, though not absolutely liable, may become. liable for costs; and is therefore incompetent as a witness in the case. Dean v. Russell, 1 Eccl. R. 411; Jackson v. Whitehead, Idem, 478.
If an executor can in any event be liable for costs (and we do not know what decision may be made on the questian of costs in this ease by the register), he has, it seems to us, such an interest in the result as will exclude him as a witness. He may become liable, and be held personally responsible for a violation of his duty as such—for a. devastavit ; and he may be held liable even for attempting to prove a will that wás not the will of the testator.
Mr. Dallas: It has been well said that this is not a proceeding inter partes, but a proceeding in rem. There are properly no parties—no plaintiff, no defendant—in the case. It is simply a question whether the instrument before us is or is not the last will and testament of Samuel B. Davis. How, we are in danger of being misled by losing sight of a fundamental principle. The interest which will exclude the witness is not a matter of feeling, or an interest which, as a friend or a man of honor, he may feel in the result. Were the witness proposed a brother of the deceased^ or of the widow of the deceased, with every feeling embarked in the issue of the ease, it would not disqualify him. An advocate in a cause is not for this reason disqualified. A consignee of goods, though deriving profit from the consignment, may be a witness in regard to it. I admit that a direct and positive interest will disqualify a witness; but it must be a certain, fixed, and definite interest in the result of the cause, and not a contingent, prospective, or possible interest merely. 2 Stark Ev. 745; 4 Harr. R. 206. But the intérest of the *61 witness here offered is contingent, and depends upon others; and in such a case it goes only to the credit, and not to the competency. Again, it is not a compensatory interest which disqualifies an executor or testamentary trustee, but an interest in the dispository part of the will, as a legacy, for instance. 2 Stark Ev. 1275; 1 Wm. Black’s Rep. 365; 12 East, 250; 12 Mass. Rep. 360.
A compensatory or remunerative interest, for services performed, is not what is termed a beneficial interest under the will. The decision in the case of Snyder v. Bulls, 17 Penna. Rep. 54, pronounced by Chief Justice Gibson, a man of lofty genius and rare judicial ability, fully sustains this principle. The law of this State, as well as of Pennsylvania, regards the laborer as worthy of his hire, and his compensation as such is not such a beneficial interest as will exclude an executor from testifying. "Unlike the legatee, he is not the testator’s beneficiary, but is presumed to receive nothing which he has not earned by his services. Whatever interest, therefore, he may have in such a case, goes only to his credit, and not to his competency.
There is and can be no liability for costs in this case on the part of the executor. It was so ruled in the case of Ross v. Hearn, 4 Harr. 101; 8 Conn. Rep. 254; 1 Gratt. Rep. 18. The executor, though a party defendant, and though" entitled to commissions, is competent as a witness. So held in the ease of John Randolph’s will. Mod. Prob. of Wills, 469, 474. The case cited from 16 Barb., on the other side, does not support their position; for in that case the executor was directly interested.
On the second point made by the other side I will say, that the bequest is not a gift; it is not a devise; it is not a legacy; but a remuneration for services rendered, and is honorary in its character. If the commissions would affect the propriety of his admission as a witness on the score of policy, the effect would be to destroy the right to the commissions, and not to destroy the will by rendering the witness incompetent.
*62 Mr. Davis: The fact that this is a proceeding in rem’ and , not inter partes, cannot operate in favor of the admission of Mr. Rogers as a witness to support the will. The question is, has he such a direct and pecuniary interest in- the result of this case as will exclude him as a witness ? It is a proceeding in rem to this extent; it binds every one as to its effect on the" instrument, which it either establishes or destroys; it binds the heirs at law'as well as the widow, though the proceeding here' is only by the widow. Nevertheless, because it is not a proceeding inter partes, the argument of the other side is, that the heirs are competent witnesses to destroy it, which reduces the argument ad absurdum. In England no commissions are allowed an executor, and therefore the cases cited from that country do not apply in this; and yet it is held there that an interest, such as a legacy, will disqualify the executor to testify.
"We contend that the witness in this case is the testator’s beneficiary, and more so than he would be as a mere legatee, because he takes the whole fund, paramount to debts and legacies, and every other disposition of them, so far as his commissions are concerned, although they may be compensatory in their character. We therefore maintain that an interest as executor, entitled to commissions by law or usage here, is a disqualifying interest; that the addition of an express bequest of commissions magnifies this interest; and the addition of a substantial bequest and devise of a large estate,' real and personal, to him as a trustee, puts the interest beyond all question. To ordinary comprehension the question, whether Mr. Rogers is or is not interested in the establishment of this will, doeá not admit of a doubt; if it be otherwise in a judicial sense, it is for the other side to show some reason or authority for it. There is some conflict in the eases on this point, but the question arises in most of them in reference to the admissibility of attesting witnesses to the will under such circumstances, and in which the actual question was, whether the witness or the will was .to be déstroyed; but Mr., Rogers is not an attesting witness to the will in this *63 case; necessary-to prove the factum of it, hut is offered as a general witness to sustain it. The case cited and mainly relied on, of Snyder v. Bulls, from 17 Penna. Rep. 54, was the case of an attesting witness. The case, I admit, does assume the position (in which it 'stands alone, however, in the American courts), that the interest of an executor, entitled by law to certain commissions, is not a disqualifying interest; and oh this point it is itself controverted hy other Pennsylvania decisions. The argument that this is not a disqualifying interest because it is compensatory merely, necessarily resolves itself into this, that any one may prove himself entitled to an office though he derives fees, compensation, or salary under it; and any one may prove a contract under which he is to render service and receive compensation, because he performs the service for the compensation. How the commissions in this case must amount to several thousand dollars, and yet are we to be told that if the testator had bequeathed to the proffered witness a legacy of five hundred dollars, he would not have been competent; but, given as a compensation in eight or ten times the amount, it is no objection to his competency? But, beyond all these objections, the witness is furthermore incompetent and inadmissible, because he is directly interested as a party to the suit,—the sole party, so far as we may judge from appearances, interested, or active in setting up the will.

By the Court,

Harrington, Ch. J.:

In expressing the opinion we have formed on the question which has been so fully and ably discussed at the bar, we shall not refer to the facts which are supposed to present a disqualifying interest in the witness, further than is necessary to raise the question of evidence; nor shall we refer to many of the points ruled in the numerous and somewhat conflicting cases cited. It will be enough to state our present view of the principles which govern the case without attempting to distinguish or reconcile the cases.
The general principle is a common law maxim, that no *64 one who is interested in the event of a cause, can he heard as a witness in the trial of that cause. Applying that principle to the case of an executor called to support the will, we may assume that the English courts regard him as a competent witness, because, according to their system, the executor takes no interest under the will, b<?ing entitled as such to no compensation by way of commissions, or otherwise. He is regarded there as taking an onerous office rather than a desirable employment. But when he takes a beneficial interest under the will, as by a legacy or bequest, he has been held even there to be incompetent on the general principle of exclusion. But in the United States, in most, if not all of them, it is otherwise as to compensation. In them the executor is entitled to his commissions by the statute law, and this interest hasi in most cases been held to exclude the executor from being a witness to support the will. In others, as in the cases cited from Pennsylvania Reports, with the deserved weight of Chief Justice Gibson’s opinion, the right to legal compensation, which attaches by force of the statute to the office of executor, does not disqualify him. But in this case, as indeed in most of the cases, when the effort has been to introduce the executor as a witness, his admissibility was essential to the probate of the will, he being one of the testamentary witnesses necessary to constitute the number required by the statute of wills. It therefore raised a question of public policy in reference to the construction of the statute, and the necessity of admitting the executor as a competent witness in that instance. The witness now offered is not an attesting, but is called as a general witness to sustain the will. He is named by it executor and trustee; entitled, in the former character, to legal compensation, and, in the latter, to compensation bequeathed by the will; together with the estate, real and personal, of the deceased, of which he is made the “ master,” as trustee for the widow and children.
In this State there has been no adjudication of this precise question. In the case of Sutton v. Sutton, 5 Harr. Rep. *65 459, which was an issue of devisavit vel non, the contest was respecting the codicils of the will. One of the executors, who took an interest under the codidils, was called as a witness and rejected; the other executor, who took no interest under the codicils, was admitted; they were hath appointed executors by the will, and neither by the codicils. This case has been spoken of as ruling the principle 'that a mere executor, having no additional interest under the will, might be a witness to support it; but the ease does not rule that point. The witness, supposing he had an interest as executor, was still an executor, whether the codicils were supported or not. He therefore had no interest whatever in the result of the case. But the other executor who took an interest under the codicils, was excluded. So far, then, as the case is an authority on the point, it is against the admission of an executor with an interest. If the cases cited can be reconciled, it must be on the principle that a mere executor derives his interest under the law, which allows his commissions; whilst an executor with a legacy, derives his interest as to the latter solely from the will. We are not prepared, however, to rule this distinction. One of my brethren thinks it is not a sound distinction; and if it were' necessary to decide • it, the inclination of all our minds is to regard the compensation as a disqualifying interest, whether derived from express provision in the will, or through the law allowing commissions to executors. It would seem like a refined distinction to say that an executor, with a compensation of one thousand dollars fixed by the will, has an interest; whilst one who has commissions to the same amount, fixed by law, has no interest in the question whether it shall be sustained or not.
But in this case the witness is not only an executor, entitled to legal commissions, but he is also a trustee, to whom the legal estate is devised in trust, with an express provision in the will for fair and liberal compensation as such. We think this constitutes a disqualifying interest, and we therefore rule out the evidence.
*66 Mr. George Browne then opened the ease on the part of the contestants of the will, to the jury.
We do not deny that the parties contesting the validity of the instrument in question, are bound by the will of the decedent, on the contrary we wish you to carry out his intentions; but while we admit that this paper writing was signed and executed by him, we deny that he knew what it contained, or that it expresses his intentions.
I will give you a brief account of Colonel Davis. He was born at Lewes in this State, September 25,1770, and died September 6, 1854, in the 84th year óf his age. In youth he was a sailor, and at an early period of his life he emigrated to Louisiana, prior to its cession to the United States, and purchased lands at a comparatively low price. In the course of time that cession followed, population flowed in, his plantations rose in value, he sold them and after the lapse of several years he returned to the State, a man of fortune. He married first a French lady in Louisiana, by whom he had one son, General Horatio Davis, now of Hew Orleans, and who is represented by his son now in Court, as one of "the contestants. After the death of his first wife, Colonel Davis married again, and had by his second wife five children, whose names have already been stated, and who, with their mother, are also contestants of the will; so that all the family are against this will, and no one for it, except the executor and trustee appointed in it.
In 1837 Colonel Davis became afflicted with cataract in both his eyes, from which he became almost blind. After an operation he partially recovered his sight, so as to see how to make marks, but not to write. Prior to the month of June, 1850, he made a will, in which he appointed Hon. Henry D. Gilpin trustee, and in which he made proper and handsome provision for his wife, retaining it, however, in his own possession. After the birth of his daughter Elizabeth, he made two codicils to that will, and when his daughter Harriet was born, it became proper for him to make another change and to have another will drawn in *67 June, 1850. So things remained until July,, 1853, when Colonel Davis was known to have called at Mr, Rogers’ office, and nothing further was developed in this respect until after his death, when this paper writing is produced.
He then proceeded to state the grounds on which they resisted and denied the validity of this instrument in question, as the last will and testament of Colonel Davis. First, that the statute of the State of Delaware contains no provision for the execution of a will by a blind man; it only relates to persons in the full possession of their faculties. Secondly, 'that when a will, has been executed in conformity with the provisions -of the statute, ,the law in general presumes knowledge of its contents and sufficient capacity to make it, .on the part of the testator; but the mere execution of a will by a blind man and its formal attestation by the subscribing witnesses, raises no .presumption in law that he knew the contents of it, and if there is evidence that the testator was blind, or from any other cause was unable to read the will, it is then incumbent on the party propounding it, to prove that he knew the contents of it. Thirdly, we shall show by the evidence which we are about to offer, that in point of fact, Colonel Davis did not know the contents of this will, and that he was under a great misapprehension as to the provisions of it, both at the time and after he had executed it. He told Mr. Read, one of the witnesses to it, after, it was executed and before he left the room, that it contained a certain bequest, -which we nowhere find in it. He also told Mr. Sellars the same thing some time after he had made it, and he had always declared to his family, before he had made his will, that he intended to make such a provision in it. Besides, we shall be able to prove that he always designed Delamore Place for his son Delaware, and that he never was known to change that purpose, and refused, not long before his death to lease it, from an apprehension which he entertained that it might keep him out of thé possession of it. He never intended to cut' off his *68 widow, as this paper cuts her off. His previous wills and instructions and his constant disposition to increase his real' and diminish his personal estate, all disprove it. I would also remark that this will contains a falsehood, of which Colonel Davis was incapable, in regard to his son Horatio and the provision which it falsely alleges he had previously made for him. He never in his life pretended that he had provided for him; he had fallen out with him and threatened to disinherit him, but he never pretended that he had provide^ for him. Superadded to all this, the will is subject to suspicion on its very face. The unbounded confidence reposed in the executor and trustee, is a suspicious feature in it, and in connection with this the liberal bounty provided for him as such in the will, is likewise a suspicious circumstance. The insertion of the word liberal after the words fair and in the- will, should be accounted for. Was the text prepared for such an interlineation, and if so, what was the meaning, or design of it?" Was the compensation which the executor and trustee is to receive, to be more or less than fair f And finally, the writer and draughtsman of the will taking such a large and beneficial interest under it, with such an unlimited control and discretion over the estate of a blind testator, enhances the obligation of the prppounder of the will, the executor and trustee in this case who drew it, to prove to the satisfaction of the jury, that Colonel Davis was fully apprised of, and correctly understood every provision contained in this paper writing at the time he executed it as his last will arid testament.
Dr. Lewis P. Bush: Was the family physician of Colonel Davis for eight or ten years past, and had heard him speak of having had an operation performed on one of his eyes for cataract. The effect of cataract is to exclude the light from the retina, as it produces opacity in the crystalline lens which covers the retina.' That lens concentrates the rays of light as they pass through and- converges them upon the retina. In one operation for cata *69 ract this lens is removed altogether; in another, it is depressed only. After this operation the .light is admitted to the retina, but the eye cannot see without the aid of a glass lens, and then he sees only in a right line, and would read as though looking at the words through a spy glass. The head and not the. eye would have to move until each succeeding word was brought within the line of his vision; and of course, such a person would read very slowly. He had never seen Colonel Davis r'ead during the last three years of his life. He had frequently seen him with spectacles on and with a newspaper in his 'hands, but never saw him during that time actually reading. For the last two years or more of his life, his hearing was obtuse, and he could not hear an ordinary tone of conversation; he could not understand a continuous reading in an ordinary tone of voice. Old persons were often sensitive on the score of age, and not willing to admit its infirmities, and Colonel Davis was peculiarly so; he never knew him to admit any. Colonel Davis’s spectacles were here exhibited to x the witness, and he identified them as eaifaract glasses.,
William Huffington, Esquire: Became acquainted with Colonel Davis in 1838, and had been intimately so since 1845. In 1846 he employed him as his legal adviser. At first he generally came to his office, but afterwards he generally sent for him, and he frequently visited him both so cially and professionally at his own house. During that year and for three or four years afterwards, he had frequently seen him read paragraphs in the newspapers and letters from Mrs. Myra Gaines and others; but in 1848 he began to leave off reading, and since 1849 he had not seen him read a line, or read any instrument prepared by him. Since that time in signing his name great care had to be taken in placing the paper before him. He told him he had been totally blind from cataract, and that he had an operation performed on one of his eyes, which partially relieved it; but the surgeon refused to operate upon the *70 other, saying that a man of his age might, well be satisfied with one eye. In 1850 he sent for the witness to draw a will for him, which he said was necessary in consequence of the birth of a daughter'1 He told him he had a will drawn by Mr. Henry D. Gilpin of Philadelphia, with several codicils since added/ to it, which he produced and showed him, but he said it would be better to have another will written, which was done. He took his instructions for it in writing, prepared the will, and he executed it._ In 1851 his hearing he perceived began to fail; it was worse, however, at some times than at others, and increased’ as he advanced in age.
Mr. Bates here propounded the following question to the witness: if he had ever heard Colonel Davis express any testamentary intentions before, or after the making of his will, and particularly with regard to a certain property which he owned, and which he intended to devise to his son Delaware.
Mr. Dallas objected to the question. The learned counsel in opening the case had made no suggestion of fraud in reference to the execution of this will.
Mr. Davis: That is what we propose to prove, though expressed in the mildest form.
Mr. Browne: If that position was not expressly assumed and announced in the opening, it was sufficiently indicated, and was only suppressed from a sense of politeness.
Mr. Rogers: Ho such delicacy is expected or desired by me.
Mr. Dallas: I am happy now to have brought the other side to a full disclosure of their design. If the declarations proposed to be given in evidence were uttered at *71 the time of executing the will, so as to constitute a portion of the res gestee, they were admissible, but if they were not uttered at the time, the rule was otherwise. The word fraud has a legal meaning, and nothing like it had hitherto been alleged on the other side. Such declarations are not admissible either to revoke or set aside a will, except on the ground of fraud, circumvention, deception, &c. Testamentary declarations of an intention to make a will in a particular way, and even declarations of duress, are not admissible for this purpose. Smith v. Fenner, 1 Gallison’s Rep. 262; Jackson v. Kniffer, 2 Johns Rep. 31; Stevens v. Vancleve, 4 Wash. Rep. 262. In no case have such declarations been admitted, except to repel or disprove a charge of fraud, for which purpose they are admissible and for no other. Comstock v. Hedlymne, 8 Conn. Rep. 254; Provis v. Rowe, 5 Bingh. 435 (13 Cong. C. L. R. 490); Mod. Prob. of Wills, 444. This principle for which I have contended, is the principle of the common law courts here and in England,; but the ecclesiastical courts in that country have, I admit, established a principle in their practice at war with this.
Mr. Bates: If this question is to be considered an open one in this State, it must be discussed at large, for it is a vital question in this case. But this court has decided it. In the case of Rash’s will, Rash v. Purnell, 2 Harr. Rep. 457, the court ruled such evidence to be admissible.

By the Court:

But the question has never been decided by our highest court—the Court of Errors and Appeals— and we will therefore hear the question argued.
Mr. Bates proceeded: The evidence is not offered for any purpose connected with the construction of a will, nor of attacking any bequest made in a will already proved, nor of setting up a paroi revocation of a will, nor of proving a fact outside, but for the purpose of ascertaining whether this paper contains the testamentary intentions of the tes *72 tator. There is also a distinction between declarations which go to prove facts impeaching the will and duress and declarations showing testamentary intention. This distinction rules out the cases cited. The admissibility of declarations as showing testamentary intention is necessary as a matter of policy to protect against fraud. Take a blind and a deaf man, and cut off all means of proving his intentions by proving his declarations, and he is liable to any kind of imposition, because it will be contended it is not necessary to prove he read or heard the will; and perhaps that it wras not the duty of the testamentary witness to ascertain whether he knew the contents of the will. The testimony is admissible by the strict rules of evidence. The fact that a paper was executed does not prevent us from going outside of it to show testamentary intentions. The very object of this proceeding is to ascertain if the will is the will, and to say that no evidence of will shall be given except through the will, is to assume that to be the will whose existence is the object of the suit. In case .of blindness the inquiry into intention is more fully opened, and it is necessary to prove the intention aliunde. 1 Eccl. Rep. 290. The animus testandi is always open. 1 Bradford Rep. 364-5. Proof of intention is necessary to the existence of the will to prove the factum ; and proof of the factum may always be by. paroi. Evidence of the testator’s mind must always come from himself. His declarations are the best and most reliable evidence.
This is not hearsay evidence, which is the testimony of a witness under oath to the sayings of another not under oath as to a fact, but it is the declaration of a party as evidence of the mind with which he did an act. The quo anima is always to be proved by his declarations, and to rule them out would be to rule out writings, even instructions, which are but evidence of intention.
I have found no case in which the evidence of intention has been rejected, though it be by paroi, but many to the contrary. 7 Vesey Rep. 509; 40 Eng. C. Law Rep. 92; 1 Eccles. Rep. 144; Johnson v. Johnson, Ibid. 390; 2 Ver *73 non R. 76; Nelson v. Oldfield, 1 Moody and Robinson, 525; Doe v. Hardy, 1 Hawks’ Rep. 248; Reel v. Reel, 3 Devereaux R. 442; 3 Phill. Evid., last ed. by Cowen and Hill, 267-9; 1 Ibid. 189; 3 Leigh Rep. 52.
Fully reviewing all the cases, and opposing Jackson v. Niffen, which was but a minority decision.
Mr. Davis: The case stands thus at present. The propounders have proved the signing of a paper by Colonel Davis, according to the statutory formalities, and the declaration that it was his will. They then rest, saying .that the will is proved. We deny that it is the will; first, because the testator, being practically blind, it is not proved to be his will unless the propounder prove that it was read to him and explained. We go a step further, and offer to prove he did not know the contents of the will, by his declarations, made before and after, that it contained dispositions which it does not contain. This is objected to as incompetent to be proved by paroi. Why ?
The statute of wills says a will may be of real and personal property. What is a will ?,. Originally any expression of the mind, verbal or written, was a will; it is the mind that makes the will, though that mind must be evidenced by writing and signature. But suppose the writing and signature deceptive,how are we to get at the mind? The declarations of the testator at any time are evidence of it, and the only mode of evidence. Fraud vitiates the will; but how shall fraud be proved but by paroi ? Insanity, duress, ignorance of the contents can be proved, but not otherwise than by paroi. And why should not the declarations of the testator respecting his own disposition of his own property be evidence of such dispositions ? Who can complain of it ?
Then as to authority. Hone of the cases cited by the other side are precisely in point. Hone say that in a case where the validity of the will is solely in question, paroi evidence of declarations of the testator respecting his testa-" mentary dispositions, is not -evidence.
*74 Mr. Dallas: Rash v. Purnell was not argued, and is therefore not authoritative. There is a will here proved ; it was on that ruling of the court we'rested. The contestants have undertaken to undermine a will proved; but they say they have proved the testator a blind man. They have proved precisely the reverse; for he was proved to be a man who could see by the aid of glasses, which he used on the occasion.
The law on this question is contained in the Code of Delaware prescribing how a will shall be made. When made with all these solemnities, shall it be destroyed by the breath of the testator in any idle conversation ? The law says it shall not be altered but with certain solemnities. Yet here it is attempted not only to alter but to destroy it by conversations.
Is a will of less force than a deed ? Yet who ever heard of a deed duly executed being nullified by the declaration of the grantor that he had no intention to make it ?
These declarations are made often with the intention of deceiving; shall they, then, be given in evidence to defeat a will made according to the testator’s wishes ?

By the Court,

Harrington, Ch. J.:

We had supposed that the question now presented had been settled by repeated decisions in this Court, and concurred in and acted upon for a number of years past in cases similar to this. It was first practically decided in the case of Duffield v. Morris’s Executor, 2 Harr. Rep. 375, and followed in the ease of Rash v. Purnell, Idem, 448, in which it was expressly ruled that paroi declarations of the testator, as to his testamentary intentions, were admissible in evidence for the.purpose of invalidating an instrument propounded as his last will and testament. But we were quite willing to hear it argued, as we were aware there are contrary decisions, and were told that the question is one of great importance in this case. It has been fully discussed, and our opinion remains unchanged that the evidence is admissible. We cannot regard it as excluded by the statute of wills, which *75 requires certain formalities to be observed in order to constitute a valid will, which are absolutely essential to establish its validity, and which cannot be supplied by any paroi proof whatever. But it does not follow that these essentials may not be controverted and disproved and the validity of the will be impeached by paroi evidence; because, to deny this, would be to give to these formalities and the mere execution of the will a conclusiveness which does not properly pertain to them. Knowledge, intention, purpose are necessary to a will; and if the want or absence of these cannot be proved by paroi, when the will is denied upon this ground, all proof to the contrary of the will itself, would in effect be excluded on these essential points; and it is difficult, if not impossible, to conceive how this question of testamentary intention, which is the very point in controversy, is to be ascertained and determined, if the testamentary declarations of the testator outside of the will, are to be rejected as altogether inadmissible and entirely excluded from the consideration of the question. With regard to the sufficiency or insufficiency, the weakness or the strength of such evidence, to invalidate a will executed with all the solemnities and formalities required by the statute, that does not properly apply to the question of its admissibility, but is a matter for the consideration and decision of the jury under the charge and direction of the Court. It is the opinion of the Court, therefore, that the inquiry propounded to the witness may be answered.
Mr. Huffingion proceeded : When he was about to write Colonel Davis’s will in 1850, we were making a valuation of his real and personal estate, which we made about $130,000. I told him I thought he would be giving his son Delaware more than his share. He said he wanted him to have the home place, to be a gentleman and the head of the family, to many young and live there, and he supposed it would be a home for his young sisters. I think the will now shown me is in the handwriting of William H. Rogers, Esq., although it is not so good as his- *76 ■handwriting in general. He then identified and proved the will produced and shown him as the will drawn by the witness in 1850. The will drawn by Mr. Gilpin with the codicil drawn by Mr. Rogers, was put. in my hands from which to draw the will of 1850, and my impression is, and to the best of my belief I so state the fact to be, that when I had drawn the will of 1850, he threw that will and codicil in the fire and burnt it. The trusts in the two wills were the same and the devise to his son Delaware were the same in both wills. Up to 1851,1 saw him as often as once a month. After the early part of that year I had not so much business with him, and did not see him so often. The last time I saw him was at the execution of the deed ■ of Mr. Bird in February, 1854. I had previously drawn the contract between him and Mr. Bird, and it was signed by Colonel Davis, at his house. He had two pairs of spectacles—one pair to read with, and another pair to see distances. I have seen him reading letters, newspapers, and instruments. I have not seen him read letters since 1848, nor newspapers since 1849, but had'not seen him attempt to read anything since 1849. He did not attempt to read the will he wrote for him in 1850, and from his having to direct his hand, he did not believe he saw a letter he made, when he signed it.
Alexander S. Head, recalled: After the other gentlemen -who attested his last will with me had left, as I had at-, tested a former will for him, I asked him why he had made another? He said as his daughter Harriet .was passing .at the moment, “ I have made a much larger provision for that child than in my other will,” and he said he had left her some lots on Fourth Street, in the city of Wilmington. I told him I thought it was judicious, as they would be ■valuable by the time she came of age. This was about ■ten minutes after the will was executed. His manner was .grave, .and I believed that he spoke the truth.
Michael Qumn: I lived a year at Colonel Davis’s before *77 his death. I worked on the farm, and went to market, and to the- post-office for his letters and papers. When I would take the letters to him, he would hold them up and look at them, and then lay them down by the side of him, and call for his wife to come and read them to him. I never saw him read one himself. When I would' bring change home from market, he would get his son Sussex to count it for him, and I never saw him count it himself. I lived with him in 1853 and 1854. When I would take the money to him, he would ask who I was. I would say Michael, and then he would speak. I have been at Colonel Davis’s since he died. I worked there five days for Mrs. Davis in March.
James T. Boies: I knew Colonel Davis for six or seven years before his death, and for three years I lived very-near him. I drew a good many papers for him; the last paper I drew for him was about two weeks before his death, for his brother-in-law, Mr. Jones. I never knew him to read any paper. I always read them to him, and he signed his name with difficulty; his hand had to be placed by another at the place on the paper for the signature. He said at that time that he either had, or intended to leave his home place to his son Delaware. I was-there on one occasion when the children had a celebration or picnic on his estate, in May last year, and heard him-, make a speech to them at their parting. He told them he was very glad to meet them there—that they were welcome to the place, and though he was an old man. and could not live long, yet when he was gone, he would leave a son who would welcome them there. He was a shrewd man of business. I do not know much about his. spectacles; he had two pairs of them. The deed I have spoken of, to Mr. Jones, was prepared about ten days before his death. When I read it to him it contained an error which he instantly detected; and before I had redrawn it, he was taken sick, too sick to sign it, and Mr. Jones lost his land. The error was this: Colonel Davis was about to give Mr. Jones a piece of ground on Drench *78 Street, in Wilmington, and he brought me the deed for the premises to Colonel Davis, from which to prepare the deed to Mr. Jones. That deed was for two pieces of land, and in drawing the deed to Mr. Jones, I. drew it for both pieces, when the Colonel intended to give him but one of them. •,
Mr. Huffington, again: Produces the agreement in writing between Colonel Davis and Mr. Bird, and hands it to • Mr. Dallas. My impression is that in the will written by Mr. Gilpin there was a reversion of some kind left to his son Alonzo. Delamore Place was devised in it I know to ,his son Delaware.
James D. Bird; I knew Colonel Davis for twenty years. I lived for several years very near him; and,- since 1838,1 have visited him every week, and sometimes often'er. Several years ago I heard him.speak of his sight and the cataract. From 1834 to 1849, or 1850,1 frequently heard and saw him read newspapers, but not writing. After that I never saw him read newspapers, and I could plainly see that he could not read. He seemed to try to read letters when he-received them, and would hold them up and look at them, but he would often get them upside down. The article of agreement between him and myself was written by Mr. Huffington; he did not read it; Mr. Huffington read it over to him several times, and would explain it to him so as to make him understand it. His hearing was bad, and he could not hear when I spoke in, an ordinary tone of voice. When he did not hear me he would ask me to repeat it, and I would speak a little louder, when he could hear me.
John M. Jones; I knew Colonel Davis since 1834; he married my sister. I arrived at his house in February, 1854, after an absence of two years. I was at his house nearly every day after that time. He died September 6, 1854, in his eighty-eighth year. In 1849 I remarked that Ms vision was materially impaired. Since that time I have frequently entered the room where he was, when he did *79 not know me with his glasses on. Since then I have never seen him read any kind of writing. He could only sign checks by my putting my finger on the line and holding it there, so that he could find the line. Since 1850 I discovered that his hearing had failed very materially. In 1847 I heard him say he intended Delamore Place for his son Delaware, and that he should represent him there. In 1852 he said to me he had been offered a price for his lot on Fourth Street, but he would not sell it, because he intended it for his daughter Harriet. In 1854 I heard him say that he had already disposed of that lot to his daughter Harriet; that she was then six years old, and, if property continued to increase in value in Wilmington for the next fifteen years as it had in the last, it would be worth, by the time she was grown, forty thousand dollars. The Cleland tract was over the Christiana Creek, and he was afraid he would not be able to get land enough around Delamore Place to make a farm for Sussex. His object was to get land enough to make three farms adjoining for his three sons. He said he thought seventy or eighty acres was enough for a farm. He said he did not want his sons to be professional men, but farmers; but, if they chose to be professional men afterwards, they might be so. After he purchased the tract of Mr. Bird I supposed he had land enough to make the three farms of the size he spoke of. I was present at the reading of the will after his death. It was produced and read by Mr. Rogers. I don’t know who sent for Mr. Rogers after the Colonel’s death—that is a mystery. I do not know indeed whether he was sent for or not. I made his house my home by his invitation when I was off* service, and I was there during his last illness and at the time of his death, and continued there for several days after it. He never walked without putting on what he called his walking spectacles.
Edward P. Jones: In May, 1854, Mr. Sellars was out at Colonel Davis’s, and the conversation turned on property in Wilmington, when Colonel Davis remarked that he had *80 given Ms lot on Fourth Street to his daughter Harriet. Mr. Sellars replied that he thought it was very well, for it would in time be a handsome fortune for her. I was there frequently in 1854. He was able to attend to business if he had some one to transact it for him. I never transacted any business for him without his direction. I was in the house when Mr. Eogers came and took the papers. Mr. Eogers asked me where he could find the certificate of the Government loan; I told him where he could get it. It was in a pocket-book, locked up in the escritoire. A few days before Colonel Davis’s death he asked me to get some of his papers for him; I did so; and he told me to look carefully over, and when I came to this certificate, he told me to put it in the pocket-book and lock it in the secretary and take care of it. I was not in the room when the secretary was opened by Mr. Eogers. I do not know where he got the key.
After introducing further testimony corroborative of the foregoing, and proving that the will and the instructions from which it was drawn were in the handwriting of Mr. Eogers, the contestants next offered and read in evidence the will drawn by Mr. Huffington in 185Ó. By this will the testator devised to his wife for life, in lieu of dower, his “ mansion farm,” comprising about forty acres, a three-story brick dwelling-house on King Street in the city of Wilmington, five thousand dollars in money, and all his household and kitchen furniture, with the exception of his statuary, paintings, and plate, and some other specially excepted articles. To his son Delaware Davis by the same will he devised “ Delamore Place” in fee simple, containing about fifty-one acres, and all his stock in a loan of the Hnited States, amounting to sixteen thousand dollars, and a bond and mortgage against Eohert M. Lewis, of Philadelphia, for eight thousand dollars, and appointed his son, Alonzo B. Davis, to be his guardian, with certain directions as to his maintenance and education until he should arrive at the age of twenty-one years. The reversion in *81 the property devised to his wife, and the residue of all his real and personal estate, with the exception of some specially enumerated articles and two burial lots, one in Donaldson's' Cemetery, Philadelphia, and the other in the Wilmington Cemetery, he devised in trust to his friend, Henry D. Gilpin, of Philadelphia, to be equally divided among his other children by his last wife, and' the survivors of them, and to the issue of such as might die in the meantime, on their respectively arriving at the age of twenty-one years, with specific instructions to the trustee as to funding and vesting the accumulations of interest in the meanwhile, and the maintenance and education of such children until they should respectively attain the age of maturity. The will also contained a provision that, in case Mr. Gilpin should' die, or decline to accept the trust and executorship of the will, the Orphans’ Court of the City of Philadelphia should appoint a trustee and executor in his place, who should be vested with the same powers, and be subject 'to the same trusts and limitations as Mr. Gilpin was, of would have been under the will.
The contestants then rested, and the counsel for the. executor proceeded to call their witnesses in reply.
Samuel Floyd: I am the cashier of the Bank of Delaware. I remember of Mr. Rogers leaving a sealed envelope like the one pow shown me, in my possession in the bank, indorsed as the will of Colonel‘Davis. It was there several months, and Mr. Rogers called for it, and I gave it to him within three or four days after his death. Colonel Davis had no open account in our bank, and never had had any but a single deposit in the Bank of Delaware, about three years before. The will and envelope were here offered in evidence to the jury by Mr. Dallas. He also offered forty-three checks of Colonel Davis, from January 20, 1854, to August 19, 1854, for an aggregate sum of $6258.12. There was one check among them of the 13th of March, 1854, which was filled up as well as signed by Colonel Davis.
*82 G. Gordon, recalled: I recollect of seeing a paper in an envelope, precisely similar to this, directed to Henry D. Gilpin, on the day of Colonel Davis’s funeral. In the morning, Mr. Rogers told me he had such a paper directed to Henry D. Gilpin. On the way out, he produced this will or paper, and asked me if I thought it would be improper in him to open it. He said he had a delicacy about opening it, as it was addressed to Mr. Gilpin. But Mr. Gilpin was then in Europe, and it was important to be known whether Colonel Davis had made any will since the one he had drawn for him, as he had been out of town for some time, and he did not know but he might have executed a codicil reviving this will during his absence. I opened the paper by his request, and found it contained this will. He said that Mrs. Davis or some one had handed it to him as an old will of the Colonel’s. When the will .now in controversy was executed by him, and which I attested as a witness, no one assisted Colonel Davis in signing his name to it; he signed it himself without assistance. Mr. Rogers held one end of the will down to keep it level while he signed it, as it had been folded up. I cannot say that Mr. Rogers did not show him where to sign his name; but if he did, I have no recollection of it. He was absent from home with his family in Savannah for some time before Colonel Davis’s death.
Mr. Bates insisted, in his argument to the jury, that although in ordinary cases knowledge of the contents of a will, or any other written instrument, by the party executing it, was implied from the mere execution of it, such was not the presumption in the case of a will executed by a person unable to read from any cause, as blindness, extreme illness, or defect of education; and the jury must be satisfied by proof, in such a case, that the contents of the will were brought home to his knowledge; and the rule on this subject was still more stringent when the draughtsman of the will enjoys his confidence, has great influence over him, and takes himself a benefit under it. 1 Wms. *83 on Ex’rs, 16, 293; Barton v. Robert, 1 Eng. Eccl. Rep. 442, in note; Parminster v. Butler, cited in that case; Finchman v. Edwards, 7. Eccl. Rep. 369. In the last case cited the testatrix was almost blind, and had to have her hand placed on the paper and guided while she signed the will, and it was held necessary to prove by positive evidence that she actually knew the contents of it. The civil law required, in case of blindness, proof that the will had been read over to the testator; but at common law it is sufficient, if there be other satisfactory evidence beyond the mere fact of his having executed the will, that he knew its contents. And such proof must be supplied at common law. Longchamp v. Fish, 2 New Rep. 415; Burger v. Hill, 1 Bradf. Rep. 363. And this rule was the same both in the ecclesiastical and the common law courts. Boid v. Cook, 3 Leigh’s Rep. 51; Harrison v. Rowan, 3 Wash. Rep. 584; Harding v. Hayes, 9 Barr’s Rep. 151. The other and additional circumstance which existed in the present case, independent of the blindness of the testator, and which would have the same effect, and impose the same obligation upon the propounder of the will, was the fact that the draughtsman of the will took a great benefit under it, was the attorney of the testator, and possessed his confidence. 1 Wms. on Ex’rs, 293; Parke v. Ollap, 1 Eccl. Rep. 273; Ingram v. Wyatt, 3 Ib. 167. By the civil law, the person who wrote a will could not take any benefit under it; the common law was not so strict, but still it required, in such a case, proof that the party executing it had full knowledge of its contents; and the object of the rule was to prevent undue influence, fraud, and circumvention, under such circumstances. He did not mean to insinuate that the executor and trustee in this ease, who drew the will and took a considerable benefit under it, had undue influence over Colonel Davis; but the suspicion which he must meet and remove was that of fraud and imposition; for the law required this, and it was his duty to do it. Barry v. Butler, 6 Eccl. Rep. 417; Purnell v. Corfield, 1 Robins’s Rep. 51; Crispell v. Dubois, 4 Barb. Rep. 393; Welch’s Will, New York *84 Legal Observer, 153; 6 Eccl. Rep. 465, anon. He submitted the question to the court as to what would constitute blindness. "What in contemplation of law amounted to blindness in a case like the present ? If it was such a defect or failure of vision as incapacitated the alleged testator from doing the act himself, or acquiring a knowledge of the contents of the instrument, so far as it was dependent on his own sight, then he was unquestionably blind both in law and in fact for that purpose.
The will could not be sustained for another reason, because it was not In conformity with the written instructions from which it was drawn. In the case of Chandler v. Ferris, 1 Harr. 454, this court held that if, in drawing out a will from written instructions, there were material variances from them, the jury should be satisfied that the testator kpew of the deviations. In the present case the variations were numerous and important; for, in the first place, there was an entire exemption of the trustee in the will from any liability on account of the estate, except for wilful neglect and default on his part, whilst there was nothing in the instructions to that effect. This express exoneration of the trustee from all liability incorporated in the will without the instructions directing it, was important and material, for it extended much further than his ordinary exemption as a trustee by law. Ip the absence of such a provision in the will, his responsibility as a trustee at law would have .been to exercise such diligence in the management of the estate as a prudent and discreet man would exercise in regard to his own property; but he had been careful in this case by the will, not by the instructions, to make himself responsible only for wilful negligence.
In the second place, there was a provision inserted, in the will for a fair and liberal compensation to the trustee, while there was not a syllable or scintilla of this to be . found in the instructions.
In the third place, the ultimate distribution of the estate to the children 'was different. In the will'it was provided *85 that, if any of th(em should die without issue, then his or her share should go as directed; hut there was no such limitation or provision in the instructions.
And in the fourth place, by the directions contained in the instructions, the estate is simply to be divided among the children on the arrival of the youngest at the age of twenty-one, and nothing more; but by the will it is directed to be sold in case it will not bear a division between them; which was very different.
He concluded with a request that the Court would charge the jury on these several points, and in favor of the various legal positions which he had assumed in his argument.
Mr. Dallas to the Jury: He had in charge the honor and happiness, if not the life, of a member of the bar in Delaware, and therefore he should not stop to deal with mere technicalities as to the onus probandi in the present case. He should content himself with a simple reference to the cases before cited. 6 Eccl. Rep. 418, 419; 1 Milne & Kean, 643. There was one thing, however, on which every one might rely in this country, whatever might be the characteristic passions and errors of the American people, and that was their sense of justice.
What was there in the will in controversy to excite the feelings, or to justify the strong and vehement objections which had been urged against it ? Was there anything in it inconsistent with the domestic duties or natural affections of the testator, Colonel Davis? On the contrary, throughout its provisions, his wife and children were uppermost in his thoughts, and his chief and only solicitude seemed to be to provide for the future welfare and happiness of his offspring. The aggregate amount of $3500 per annum, until the youngest child arrived to the age of twenty-one years, was provided by the will for the support and maintenance of the family, besides a convenient and comfortable residence in the city of Wilmington. And why, when the will was executed, was it handed over by the testator to Mr. Rogers, to have the charge and custody *86 of it ? The reason and answer was plain and obvious. It was because he had appointed him his trustee and executor, and he was the proper person to have it, as he was to administer his estate and execute its provisions.
How the real question presented to them was this, was Colonel Davis on that day capable of making a will ? It was said that he was old; but he was proved to have retained up to that time unimpaired all the faculties of his mind, and no witness had pretended to say that he was unable to make a will; nor was there an earthly doubt on the mind of any one of the testamentary witnesses that he perfectly knew and understood what he was doing, and the contents of the will which he had just executed. He said to these witnesses, Messrs. Gtordon and Harrington, soon after their arrival at his house, and some casual conversation had passed between them, “ I will be obliged to you, gentlemen, if you will withdraw; I desire to confer with my counsel,” meaning Mr. Rogers, “ on the subject of my will;” and, in accordance with this intimation, they retired from the room, and he and Mr. Rogers were left alone. How, he maintained, and the authority of a case which he had already cited would sustain him in the position, that this of itself was sufficient to establish the will; for in that case the Chancellor held that if the testator might have known the contents of the will, or had an opportunity of knowing them, he would be presumed in law to have known them, and it would be sufficient to sustain the will.
Blindness would constitute no legal disability, or incapacity to make a will; but he did not contend that the testator obtained his knowledge of the contents of the will through the medium of the eye, but through the medium of the ear, and they had such a mass of circumstantial and documentary evidence that Colonel Davis fully understood the contents of the instrument in question, as to make the conclusion and conviction that he did know the contents of it absolutely irresistible.
In the first place, when a man puts his name to a piece *87 of paper, the law presumes he knows its contents at the time of signing it; and in the present case this presumption was strengthened and confirmed by the deliberate manner in which the testator signed and executed the will in the presence of the subscribing witnesses. Besides, the will itself was full of intrinsic evidence that he knew its contents. He could show from written evidence that substantially the same will had been made not less than six times by the testator,—first, in the will of 1845; secondly, in the will of 1850, and the codicils to it; and, thirdly, in two sets of instructions for the will of 1853, with the will itself. These wills and instructions all bore the same impress, the same main features, and every one of them had the same precise trust provided for in it, and the same peculiarities, in regard to the provisions for his children, running through the whole of them. The same compensation to the trustee was to be found in all óf them; and there was not a power conferred on the trustee by the will of 1853, that was not conferred by the will of 1850; nay, the powers conferred by the earlier wills were greater than those conferred by the latter. The will of 1845 devised Delamore Place to his son Alonzo, and contained the same provision to be found in the will of 1853 for leasing it; there was the same direction in each of his wills that his daughters should be sent, at a certain age, to boarding school, and the specific bequests were very nearly the same in all of them. How, when they traced up all these various provisions of the several wills, they would find that the finger of Colonel Davis had been and was visible in every one of them, and that but one man, and no one but Colonel Davis, could have conceived and dictated the whole of them; and if the will and instructions of 1853 were counterfeits and forgeries, then all the other wills and instructions were also counterfeits and forgeries.
He denied that there were any essential discrepancies between the will of 1853 and the written instructions from which it was drawn. The will but elaborated and expressed more fully what was more concisely indicated in *88 the instructions; and if there were any variations in the will from the instructions, he insisted upon the authority of Chandler v. Ferris, 1 Harr. Rep. 464, and Hearn v. Ross, 4 Ib. 46, that they were not only known and approved by the testator, but were not of sufficient substance and importance, even if unknown to him, to affect the validity of the will.
Mr. Davis to the Jury: After Messrs. Gordon, Harrington' and Rogers had taken their leave of Colonel Davis, on the day the will was executed, Mr. Read, who remained, fell into conversation with the latter, when he inquired of Colonel Davis why he had made another will, as he had witnessed a former will made about three years before by him; to which Colonel Davis replied, pointing to his little daughter, who was present, playing on the floor, or passing at the moment, that he wanted to make provision for that child; that he had left her his lots on Fourth Street, in the city of Wilmington, and that they would be valuable by the time she was grown up. This was said by him within fifteen minutes after he had put his name to the will; but there was no such provision in the instrument. He then made this point to the Court, that if Colonel Davis signed this paper in the handwriting of Mr. Rogers, believing that it contained this devise to his daughter Harriet, it was null and void as his last will and testament.
Again, his repeated declarations, and the serious and deliberate expressions of his intentions to leave Delamore Place to his son Delaware, and his refusal to lease it to Mr. Hall for a longer term than five years, because he knew that his son would be of age in that time, and prepared to take possession of it, and the accumulated evidence of all the other witnesses on that point, conclusively showed that Colonel Davis could not have known the contents of the will propounded, and that it was, therefore, not his will.
When a party was in possession of his natural faculties, the law presumed knowledge of the contents of his will from the fact of its execution by him; but where he was *89 blind, paralytic, or deprived of the use of his faculties, so as to be unable to read, and the person who drew the will took a benefit under it, the law does not presume knowledge of its contents from the fact of execution; but some positive proof must be produced, or some circumstantial evidence having the weight and character of positive proof, must be adduced to show that the testator actually knew the contents of the identical instrument which he subscribed as his will; because in such a case,, and without such additional proof, the law did not presume that he had knowledge of its contents. But no such proof had been produced in this case, and, therefore, he should ask the Court to instruct the jury that they could not find this to be the will of Colonel Davis.
It had been proved that, for three or four years before his death, he was never seen or known to read any paper ; and it was proved that his eyesight was so much impaired, that he was not able to read this paper in the handwriting of his attorney, who drew it and took a benefit under it; and it was, therefore, imperatively incumbent on the other side to prove that it was read to him, or that its contents were otherwise explained and made known to him through the medium of his hearing. But there was no proof that, at the time of its execution, or at any time afterwards, Colonel Davis was made acquainted with its contents. The fact that the old man was hard of hearing, and that no note or sound of reading was heard by Mr. Gordon or Mr. Harrington, while they were walking the porch within a few feet of the room and place where Colonel Davis and Mr. Rogers were together, was strong and conclusive evidence that the will was not read that day to him.
He then proceeded to note and comment upon the discrepancies between the will and the instructions; the statement that he had provided for his former children, which was not in the instructions, and which was untrue, although inserted in the will; in the order to pay debts; in varying the compensation and legal responsibility of the trustee; in the payment of annuities; the transmission of the estate *90 on the death of any of the children; in the power given by the will to the trustee to sell the whole estate without bond or security, in case it would not divide; and in the estate given to the widow in lieu of dower. In all these material provisions there were marked and material discrepancies between the will and the instructions, which could not fail, on the authority of the cases cited on the other side, to invalidate the former in the absence of any proof that they were known and approved by the testator.

The Court,

Harrington, Ch. J.,

charged the jury: On the 5th of July, 1853, jSamuel B. Davis, long a resident of this county, put his signature to a paper writing which he then stated was his last will and testament, in the forms of law required as the evidence of so important an act as the testamentary disposal of a man’s property. The execution of this paper has thus been proved. It is to be taken to be the will of Colonel Davis, if nothing more appear either to impeach or to support it. It needs no further support on the part of those who set it up for a will, until something is shown to destroy or to impair the credit which it derives from the fact that it was signed as a will, and attested as a will, and published as his will, by the testator himself. This is what is meant by primó, fade proof or proof of t\ie factum; a proof which, in ordinary cases, imposes upon any party denying the legal conclusion which is to be drawn from its execution, the burden of showing that it is pot the will which these formalities make it seem to be.
Testamentary power is an important attribute of the right of property, and a great stimulus to its acquisition, and to the industry and care-taking necessary to its acquisition. The absolute right, therefore, of disposing of it according to the will and pleasure of the possessor is to be recognized' as a principle of justice and of sound policy. It has not been denied or restricted in the argument of this ■case, but it is conceded that Colonel Davis had the right to dispose of the large estate which he. possessed according *91 to Ma will and pleasure. It will be for you to decide whether he has done so.
The paper which I hold in my hand is proposed to you as the evidence of the will of Colonel Davis. It is opposed and objected to by the widow and children, who deny that it contains the evidence of his testamentary purposes,, and who affirm that it never was his will. The -register, to whom it was offered for probate, has seen proper to take the advice of a jury on this question; and has sent to us for trial the issue, which you have been qualified to answer, “whether the paper writing, purporting to be the last will and testament of Samuel B. Davis, deceased, and heretofore admitted to probate, is or is not the last will and testament of the said Samuel B. Davis, deceased?”
This, gentlemen, is a question of fact. It is so purely a question of fact that formerly it was not the practice for the Court to charge the jury upon the trial of such issues, supposing that its duty was discharged by merely presiding at the trial, regulating the proceedings, and deciding questions of evidence that might arise. Of late years the practice has been for the Court to add a brief charge to the jury, with a view to direct attention to proper points for their consideration. We have been asked to do so on this occasion,; and certain matters have‘been presented to us as legal propositions, upon which we are asked to- charge you; but after all, gentlemen, what,law can there be applicable to the solution of a mere question of fact, which is not the law of common sense, belonging no less to others .than to the judicial . mind, and very fully shared by the intelligent jury whose duty it is to decide this ease.
A mil,—what is it ?. and how is it to- be known ? Does it rest in the speech by which it is manifested, or the paper through which it is supposed to be communicated, or the act by which it is apparently indicated ? All these are but mediums through which the purpose of the testator is to be understood by others. The will rests in his intention and purpose; the knowledge of which, though we may not in the nature- of things ever reach it with demonstrative *92 certainty, we satisfactorily attain to, just in proportion to the safety and reliability of' the medium through which it is sought. This is a common sense remark, appreciable by you as fully as by any one, and yet it contains the foundation arid substance of all the law on this subject. Does a man, in the full possession of his faculties, indicate by word, or writing, or gesture, that it is his intention a certain person shall have his property upon his decease ? That is his will, even though the policy of the law may not allow it thus to be proved; and a man, who, from any defect, mental or physical, or from mistake or deception, should in all the forms of - law dispose of his property as ‘he did not in truth mean to dispose of it, would not thereby express his intention, and the instrument would not be his will.
The force and value of the act done as indicative of the intention, must -depend on all the circumstances surrounding it. If a man capable of reading a paper executes it with due formality, it is a reasonable inference that he knows its contents, and that it contains his intentions. So strong is this inference in case of the execution of deeds and other instruments, that it becomes a legal conclusion which, under ordinary circumstances, the party is not permitted to deny; and this has, according to some of the cases which you have heard cited, been applied even to wills. You heard the question argued on an objection which was made to our admitting paroi declarations of the testator to contradict the conclusion thus drawn from the act of executing the paper, an argument which was based on the legal as well as the reasonable inference from that act; but we considered, as it has heretofore been adjudged by our courts, that there is no such legal conclusiveness to be given to the formal act of executing a paper for a will, as to preclude proof arising from the declarations and acts of the testator, before, at the time, or after, and all the surrounding circumstances, that the paper is not his will. Generally the animus testandi is the natural and primary inference from the act of signing and formal publication; *93 but this inference may be weakened or destroyed by any attending circumstances of sufficient force, by evidence of the weakness or incapacity of the testator to do, or of the want of intention actually to do, what he seems to do by that act. This is not admitting paroi evidence to vary the will, but to ascertain whether it is really the will of the decedent.
We, therefore, throw the case open upon the evidence, not only in conformity with former practice, but as required by our judgment of the law, now again confirmed upon full and forcible argument. Proof, therefore, satisfactorily made, of instructions given by the deceased; of his declarations respecting his intentions; of his known affections or dislikes; of the position and quality of his estate; of previous testamentary intentions; of instructions or actual dispositions; of his own condition in reference to health or disease, of body or of mind; his physical infirmities, especially of the organs called into action in making or understanding a will,—all these are, in our judgment, proper subjects of consideration on the important question, whether the paper does or does not contain the real testamentary intentions and wishes of the party who signs it. Take them all, gentlemen, and review the testimony on these and all other matters bearing on this question; I need not, and I will not, particularize them; I might omit something in your view important, or present something differing in some respects from your views of the evidence of it; they are all yours, their force as well as their existence, and you must decide upon them. The whole evidence has been laid before you with great propriety both of question and answer, studiously avoiding everything immaterial, and plainly presenting everything that might tend to elucidate the great question whether Colonel Davis made this paper with a knowledge of its contents, and whether it expresses his testamentary purposes.
I shall mention only such facts as must be stated in the legal positions necessary to be noticed, and always subject to your correction. Colonel Davis attained an ad *94 vanced age; he was several years over eighty when this paper was signed; he was more or Jess blind; more or less deaf; the former from disease,.relieved partially at one time by an operation; the latter from the ordinary consequence of advancing age, and the extent of which we specially submit to your decision; but as to his mental capacity, it has not been questioned but that he was competent to make a will. He made a will prior to 1845, a portion of the contents of which has been proved by Mr. Buffington. He made a will in 1850, which is in evidence; and he executed this paper as his will in 1853. Is that his will ? •
In conducting your examination through the facts to a solution of this question there are some rules of law that may aid you. One is the onus probandi. We have, remarked upon this before. The party who alleges the will must prove that it was made as a will and with a will, by a party capable of doing the act, having the knowledge that he was doing it, and having knowledge of the contents of the paper which professes to be the evidence of his testamentary purpose. It is not essential to be proved in any case that the will was actually read over by or to'the testator, if there be other evidence sufficient to satisfy the jury that he was made acquainted with its contents. A blind man may make a will; a valid will may be drawn by a party taking an interest under it; but the blindness of the testator, or the interest of the party drawing and attending to the execution of the instrument, are circumstances tending to put the jury on their guard in scrutinizing the evidence which is offered to show knowledge of its contents. In Harrison v. Brown, 3 Wash. C. C. Rep. 584, the proposition was submitted that it was necessary to prove the reading over of the will; but Judge Washington said it was not necessary, in order to establish a will, that the person claiming under it should prove that it was read over' to the testator in the presence of the attesting or of other witnesses. The law presumes, -in general, that the will was read by or to the testator. “ But if evidence be given that the testator was blind, or from any cause inca *95 pable of reading; or if a reasonable ground is laid for believing that it was not read to him, or that there was fraud or imposition of any kind practised -upon the. testator, it is incumbent on those who would support the will to meet such proof by evidence, and to satisfy the jury either that the will was read, or that the contents were known by the testator.” [See also Eng. Eccl. Rep. 370; Fincham v. Edwards, 3 Ibid. 167; Ingram v. Wyatt, 1 Ibid. 442; Barton v. Robbins, and 1 Wray’s Executors, 16, 293.]
In Barry v. Butler, 6 Eng. Eccl. Rep. 418-9, it is said, “ The strict meaning of this term 1 onus probandi’ is this, that if no evidence is given by the party on whom the burden1 is cast, the issue must be found against him. In all cases this onus is imposed on the party propounding a will; it is, in general, discharged by proof of capacity and the fact of execution; from which the knowledge, of, and assent t'a, the contents of the instrument aré assumed; and it cannot be that the simple fact of the party who pre- ' pared the will, being himself a legatee, is in every case and under-all circumstances to create a contrary presumption, and to call upon the Court to pronounce against the will, unless additional evidence is produced to prove the knowledge of its contents by the deceased.” “All that can be truly said is, that if a person, whether attorney or not, prepares a will with a legacy to himself, it is at most a suspicious circumstance, of more or less weight, according to the facts of each particular case; in some of no weight at all, as in the case of a trifling bequest out of a large estate, but varying according to circumstances; for instance, the quantum of the legacy, and the proportion it bears to the property disposed of, and numerous other contingencies ; but in no case amounting, to more than a circumstance of suspicion, demanding the vigilant care and circumspection of the Court in investigating the case, and calling upon it not to grant probate without full and éntire satisfaction that the instrument did express the real intentions of the deceased. Eor can it be necessary that in all such cases, even if the testator’s capacity is doubtful, the *96 precise species of evidence of the deceased’s knowledge of the will is to he in the shape of instructions for or reading over the instrument. They form, no doubt, the most satisfactory, but they are not the only satisfactory description of proof by which the cognizance of the contents of the will may be brought home to the deceased. The Court would naturally look for such evidence; in some cases it might be impossible to establish a will without it, but it has no right in every case to require it.”
These quotations apply in principle to the case before you, and you must apply the facts of the case to them. Colonel Davis was more or less blind; the draughtsman of the will, though not by name a legatee, took an interest under it as executor and trustee, the extent and force of which the jury must judge of, in estimating the amount of suspicion that this circumstance throws over the case, and the corresponding necessity it produces of evidence to be required, in addition to the act of formal execution, to satisfy the jury that Colonel Davis had a knowledge of the contents of the will.
The interest is such that we were obliged, under our view of the law of evidence, to exclude the executor and trustee from giviiig testimony in the cause; but we remark, also, that it is not the naked interest of a gratuitous legatee, but an interest with an obligation of service. We leave its force in this connection to your judgment; and as to the relation of attorney and client existing between the draughtsman and the supposed testator, it is not an absolutely disqualifying relation, but is to he considered solely with reference to its hearing upon the question what amount of evidence of knowledge of contents the jury will require to be satisfactorily proved in order to establish the paper as a will. In most cases, an attorney drawing a client’s will, would not he a circumstance of remark, even where he took an interest under it, as where proof of capacity and of the factum are both complete; in others, where capacity or knowledge of contents is the point of consideration, the circumstance may attract more or less attention' *97 from the parties and the attending circumstances. As a general principle the law does not imply a controlling influence of a lawyer over his client.
The contestants ask us to charge that if the proof establishes either inability of the testator from blindness to read the will for himself, or that an interest is shown in - the draughtsman of the will and person managing its execution, the will fails, unless there be proof affirmative, beyond the act of execution, that it was read to the testator, or a knowledge of its contents was otherwise communicated to him. We have answered this proposition affirmatively, in the quotations before made, and to which I have asked the jury to apply the facts in evidence.
But if that state of things is made out, it is alleged, on the part of the executor, that knowledge of the contents of this will and proof of intention are made out, by the correspondence of its contents with previous wills- made by Colonel Davis; by the instructions given to Mr. Rogers to draw the will; by the circumstances attending its execution, other than the mere fact of signing and publication, which, they say, afford proof of actual reading, or at least the probability of it, in the absence of the testimony of the only person who knows the truth of that matter, but who cannot, by reason of his relations to the will, be heard. To this the contestants answer, denying the correspondence of this with previous wills; denying the instructions, or suggesting that the proof of the instructions is weaker than that of the paper they are invoked to support; that there are many discrepancies between the supposed instructions and the instrument on trial sufficient in themselves, if not shown to have been explained to the testator, to'render the will void; and that, in respect to any evidence of actual knowledge of the dispositions contained in this paper, it has been met by proof of declarations made by the testator, that it contained other and different dispositions.
- Gentlemen, we do not think it proper to enter upon anything like an application of the evidence to these several propositions; the case has been fully and ably argued *98 on them all, and that argument must be fresh in your recollection. We only call your attention to the topics, and-leave the consideration of them to you. As to instructions, if they are satisfactorily proved, to have emanated from the testator, with knowledge of their contents, they are evidence of great force in support of a will drawn in pursuance of them; and, being generally but heads or suggestions, the proper amplification of them in the more formal instrument is right and proper; but as to essential variations, this Court said in Chandler v. Ferris that if the jury were of opinion that these differences' existed to such an extent as to make the will essentially different from the instructions, they must then judge from- the evidence whether these deviations were made with the knowledge and consent of the testator. If they were not made known to him, if the will was not read over, or its contents and variations from the instructions otherwise explained to him, then it would not be his will; but if he knew of and approved the alterations, he adopted them by the execution of the will, and the same ought to be confirmed. [1 Harr. Rep. 464.] The same remark may be made, generally, of all declarations made by the testator, in reference to what was to be, or what had been inserted in his will. We have admitted such declarations in evidence as bearing on the question whether Colonel Davis knew of the contents of this paper and approved of them, as to which, if there be satisfactory evidence derived from other sources that he had such knowledge, these declarations would not be allowed to controvert the more solemn expression of intention in the will itself. But, in the absence of such other evidence of knowledge of its contents, and considered solely with a view to the question whether the paper was ever read or explained to him, declarations satisfactorily proved to have been deliberately made by him, in good faith and credited by the jury, of testamentary bequests altogether different from the bequests of the will, would be evidence to disprove his knowledge of its actual contents. Thus we have been specially asked to charge you, that if *99 you believe from the evidence that Colonel Davis actually thought the Fourth Street property was devised to his daughter Harriet, or that Delamore Place was devised to his son Delaware Davis, in his will, and they are not so devised, this would be evidence that the contents of this paper were never made known to him so that he understood it, and the paper could not therefore be established as his will. The two things are inconsistent, and therefore could not exist together. • A person having testamentary capacity could not believe he had devised important portions of his estate one way , while he had disposed of them to another, on the same day of the execution of his will', if he knew of the contents of the will. At the same time the declaration of such belief is open to any remark tending to impeach its force, and subject, as all other testimony is, to he Weighed by the jury.
The verdict of the jury was against the will.