Crispell *v.* Dubois.

---

SAME TERM.    *Before the same Justices.*

CRISPELL *vs.* DUBOIS.

What evidence is sufficient to overcome the presumption of fraud and undue influence having been practised in procuring the execution of a will in favor of the testator's physician, arising from the confidential nature of the relation existing between him and the testator.

Where a will containing a devise in favor of the medical attendant and confidential adviser of the testator, is drawn by the devisee himself, although it would be much more satisfactory to the court, to have direct evidence that the testator

Crispell *v.* Dubois.

gave instructions for drawing the will, or that it was read over by, or to him, yet such evidence is not indispensable.

On a feigned issue to try the question as to the validity of such a will, more is required, however, than bare proof that the testator was of sound mind, and of the execution of the will according to the formalities required by law. Some affirmative evidence must be given, to show that the testator knew the contents of the will, and that it expressed his real intentions.

But while it is necessary, in such a case, to prove that the will was the spontaneous intention of the testator, such proof may be made out in any mode in which his real intention can be ascertained.

PREVIOUS to the 12th day of January, 1846, the plaintiff, as devisee and executor of the last will and testament of Judith Dubois deceased, made application to the surrogate of Ulster, to prove the will. The application having been opposed by the defendant, a brother of the testatrix, the surrogate refused to admit the will to probate. From this decision the plaintiff appealed, pursuant to statute, to the late circuit judge of the second circuit, who on the 19th day of December, 1846, made an order reversing the decision of the surrogate, upon a question of fact, and directed a feigned issue to try the validity of the will. The issue was tried at the Ulster circuit, in March, 1847, before Parker, circuit judge.

Upon the trial the plaintiff gave in evidence the alleged will, bearing date the 30th day of July, 1845, executed in the form required by law. By the will the testatrix devised to the plaintiff, and his heirs and assigns, all her real estate, chargeable with the payment of four thousand dollars. Three legacies of $100 each, were directed to be paid out of this sum, in one, two, and three years after her decease, to persons named in the will. One-third of the remainder was to be paid to the American Bible Society, in four years—another third to the American Tract Society, in five years—one-sixth to the Foreign Missionary Society, in six years, and the remaining sixth to the Domestic Missionary Society in seven years. No interest was to be chargeable upon any of the legacies until they should become payable. The witnesses to the execution of the will, were John Crispell, the plaintiff's son, and Nelly D. Crispell, the wife of John Crispell. The testatrix resided upon a

Crispell *v.* Dubois.

farm in the town of Hurley, Ulster county. She was 61 years of age, and had never been married. The plaintiff is a practising physician. He had for many years lived a near neighbor to Miss Dubois, their farms adjoining each other. At the time of the execution of the will she was laboring under a severe attack of bilious cholic, of which she died about 34 hours afterwards. The plaintiff was her medical attendant. John Crispell testified, that when the will was executed, he went to the room of Miss Dubois with his father; that his wife and several other females were in the room at the time; that Miss Dubois was sitting up in her chair; that soon after they entered, his father asked those who were present, except himself and his wife, to leave the room. After they had left, his father presented the will, and asked her if she was ready to execute her will. She replied that she was. He then handed the will to her, with a pen, and asked her if she wanted a board or a stand to write on. She answered that she did not; that she could sign it upon her knee, and she did so; that his father then asked her if she acknowledged that to be her hand and seal to her last will and testament, and requested John and Nelly to sign it as witnesses; that she replied she did, and they then subscribed their names as witnesses to the will, in her presence. The testimony of Nelly D. Crispell, the other witness to the execution of the will, was substantially the same as that of her husband. Other witnesses were examined as to the capacity of the testatrix, and previous declarations of her intentions in respect to the disposition of her property. Their testimony will be found sufficiently stated in the opinion of the court.

The circuit judge charged the jury that in ordinary cases it was sufficient for a party seeking to establish a will, to prove that the testator was of sound mind, and had executed the will according to the formalities required by law; but that when, as in this case, the alleged will was prepared by an individual standing in a fiduciary relation to the deceased, and who took a large benefit under the will, more was required than bare proof of the execution; that some affirmative evidence should be given that the testatrix knew the contents of the will; that

Crispell v. Dubois.

the law inferred knowledge in the testator of the contents of a will executed by him, when in the full enjoyment of his mental faculties, unimpaired by disease, and when the party drawing the will took no interest under it; but if the understanding was weakened by disease or otherwise, then the jury, before they found the alleged will valid, ought to be satisfied, from other evidence than mere signature, or the formal acts of bare execution, that the testatrix knew its contents; that such knowledge on her part might be shown either by proving that she read it, or heard it read, or that she dictated its provisions; that the facts and circumstances attending its execution, connected with previous declarations of intention or directions to have such a will drawn, might be sufficient to raise a presumption that she knew the contents of the will she executed ; but that such facts, circumstances, and declarations, should be so strong and convincing as to satisfy the jury that the alleged will was, in every respect, the will of the deceased, and the result of her own free and unbiassed judgment ; that as the plaintiff had long acted as the agent and confidential adviser of the deceased, and as her physician, and was attending her in that capacity, before, at the time of, and after the execution of the alleged will, the jury ought to be well satisfied that the instrument in question was not procured by any undue influence which he might have exercised over the deceased, but was her own free act and will, executed with full knowledge of its provisions. And if the jury were satisfied from any such proof, that the instrument was the will of Judith Dubois, deceased, and that she executed the same with a knowledge of its contents, they must find for the plaintiff, otherwise for the defendant. The jury having found a verdict for the plaintiff, a motion was now made by the defendant for a new trial.

*J. Thompson & M. Schoonmaker*, for the plaintiff.

*M. T. Reynolds & J. O. Linderman*, for the defendants.

*By the Court*, HARRIS, P. J. The law applicable to this case was stated with singular clearness and precision by the circuit

Crispell *v.* Dubois.

judge, in his charge to the jury. In a recent case, decided by
the judicial committee of the privy council in England, upon
an appeal from the decree of the prerogative court, Baron
Parke, in delivering the judgment of the court, says : "The
rules of law, according to which cases of this nature are to be
decided, are two ; the *first*, that the *onus probandi* lies, in every
case, upon the party propounding a will, and he must satisfy
the conscience of the court that the instrument so propound-
ed is the last will of a free and capable testator. The *second*
is, that if a party writes, or prepares a will, under which he
takes a benefit, that is a circumstance which ought generally
to excite the suspicion of the court, and calls upon it to be vigi-
lant and jealous in examining the evidence in support of the
instrument, in favor of which it ought not to pronounce unless
the suspicion is removed, and it is judicially satisfied that the
paper propounded does express the true will of the deceased."
(*Barry* v. *Butlin*, 1 *Curteis' Ecc. R.* 637.) Both these rules
are, in substance, embraced in the charge of the circuit judge,
and we must therefore assume that the jury were satisfied
from the evidence, that the alleged will was, indeed, the true
last will of Judith Dubos, and in truth expressed her in-
tentions.

The circumstances of this case were such as to create a
strong presumption against the validity of the act ; a presump-
tion so strong that it should only be overcome by very clear
proof of the unbiassed intention of the testatrix to make such a
disposition of her property as is contained in the will, and that
it was executed by her with a full understanding of the nature
and effect of the instrument. The will was drawn by the
plaintiff himself; and, so far as it appears in evidence, without
instructions from the testatrix. The plaintiff stood in a rela-
tion of special confidence to the testatrix, both as her medical
attendant and her confidential adviser. Considerable pains
was shown to have been taken by the plaintiff to secure the
presence of members of his own family as witnesses to the exe-
cution of the will, and to exclude others from being present,

HARVARD LAW SCHOOL LIBRARY

Crispell *v.* Dubois.

The extent of the benefit to be derived by the plaintiff from the will, if it is established, does not appear. But it was conceded upon the argument that the value of the real estate devised to the plaintiff by the will considerably exceeded the amount of legacies with which it is charged. The deceased was at the time laboring under the influence of a painful illness, which proved fatal a few hours afterwards. The objects of her bounty were all strangers to her blood, to the exclusion of an only brother. The case certainly presents a remarkable combination of unfavorable circumstances. By the civil law such a will would be absolutely void. *Qui se scripeserit hæredem* rendered void all the provisions in a will in his own favor. And though this rule has not been adopted in our own courts, they do demand satisfactory proof, in such cases, that the party executing the will clearly understood, and freely intended to make, that disposition of his property which the instrument purports to direct. The doctrine is well stated in *Paske* v. *Ollat,* (2 *Phillimore,* 323 :) "Where the person who prepares the instrument and conducts the execution of it, is himself an interested person, his conduct must be watched as that of an interested person. Propriety and delicacy would infer that he should not conduct the transaction ; and, *a fortiori,* where he is the confidential attorney of the deceased, and where the benefit conferred is to a considerable amount."

Upon the argument of this case I was strongly inclined to think that the presumptions against the will, arising from the circumstances of the case, ought to be held *conclusive* against the instrument ; especially as there is an entire absence of all direct proof of instructions, or that the testatrix was even consulted in respect to the will itself, or knew its contents. But after a very full and careful examination of a great variety of adjudications upon kindred cases, I have, though not without considerable doubt and hesitation, come to the conclusion that the question was properly submitted to the jury ; and although I might have been better satisfied, had the verdict been against the validity of the transaction, yet that it cannot be set aside as against evidence.

Crispell *v.* Dubois.

In respect to the capacity of the testatrix, it is proved that she was a woman of fair intellect and good education; that during her last sickness she retained her mental faculties. Dr. Nelson, who visited her the day after the will was executed, testifies that her disease was not of a character to affect her mind, and that when he saw her, her conversation was clear and intelligent.

In support of the will, the plaintiff has proved various declarations of the testatrix, tending very clearly to show that the will is in conformity with intentions long previously entertained. The evidence of mutual disaffection and dislike between the testatrix and her brother is quite clear and distinct. This estrangement had existed for several years. All intercourse between them had ceased. While such a state of complete alienation existed, it was to have been expected the sister would make such a will as should prevent her brother, with whose conduct she was so much dissatisfied, from enjoying her property. Accordingly, she is shown to have repeatedly declared her intention to seek elsewhere for the objects of her bounty. From the testimony in the case, there is some reason to believe that the defendant's unkindness towards his sister was the true cause of his exclusion from a participation in her estate; and, as was said in the case of *Barry* v. *Butlin*, above cited, that he was himself "the conspirator against himself." I think any one acquainted with the state of feeling existing between the sister and her brother, would not have expected to find in a testamentary disposition of her property any provision in his favor. He is shown on several occasions to have employed language highly offensive to her, and nothing appears to have occurred subsequently, calculated to conciliate her affections.

If the brother, who seems to have been her only near relative, is to be set aside, who then would be so likely to share in her bounty as the plaintiff? She evidently had great regard and partiality for him. She repeatedly acknowledged her obligations to him and his family, for kindnesses, and contrasted their friendly offices with the neglect of her own relatives. She is

proved, moreover, more than once to have declared her inten-
tion that the plaintiff should have her farm after her death;
and intimated, at least, that he should have it for less than it
was worth.   I regard it, therefore, as highly probable from the
relations of friendship and confidence which seem long to have
existed between the plaintiff and the testatrix, that when she
had determined to exclude her brother, the plaintiff would, to
some extent, become the object of her bounty.   It would seem
from the evidence in the case that there was no one who would
be likely to stand in competition with him.

The testatrix is also shown to have been a pious woman,
and interested in the religious enterprises contemplated by the
institutions which, by the will, are made her principal legatees.
In April or May, previous to her death, she told Ann Van Gaas-
beck that "she would will the best part of her property for
religious purposes, and would not will her brother any thing.
Several years before, both the testatrix and her sister, who had
subsequently died leaving all her property to the testatrix, had
told David Vandemark, who worked for them, that "their
brother should not have any of their property, but that Dr.
Crispell should have it; and that it should go for missionaries,
churches and religious purposes."   They spoke of it several
times during the two years he lived with them.   She told
Abraham Carney, the year before she died, that "the mission-
aries and those who were not able to buy bibles, would thank
her more for her property than her friends; and she did not
think they should have any of it."   In a conversation with
Edward Litts, about her property, in the spring of 1844, she
said "the doctor wanted the farm, and it was likely he would
have it."   Benjamin De Graaf swears to a conversation with
the two sisters as early as 1841, in which they expressed their
intention that Doctor Crispell should have the property, because
he had been their particular friend, and always ready to help
them in their difficulties.   This witness also stated that he had
repeatedly heard the testatrix say that John could not expect
to have any of the property.

These are the probabilities in favor of the will.   I think any

Crispell *v.* Dubois.

one acquainted with the feelings and purposes of the testatrix, would have been prepared to expect to find in her will provisions not unlike those found in the instrument in question. It is true that under the unfavorable circumstances which attended the execution of this will, it would have been much more satisfactory to have had evidence that the testatrix gave instructions for drawing the will, or that it was read over by her or to her. Prudence and propriety, both, should have dictated this precaution to the plaintiff. It would have relieved him from the suspicion which must ever hang over the transaction. But although such evidence would unquestionably have been the most satisfactory, I am not prepared to say that it was indispensable. I have been able to find no case in which this particular description of proof has been required. On the contrary, I understand the doctrine to be well settled that, while it is necessary in such cases to prove that the will is "the spontaneous intention" of the testator, such proof may be made out in any mode in which his real intentions can be ascertained.

In *Butlin* v. *Barry,* already cited, the testator, by his will, gave to the solicitor who drew it, £3000 ; to his butler £3000 ; and to Butlin, his medical attendant, £2000, together with the residue of his property after the payment of some other small legacies, appointing the latter his sole executor. An only son was excluded from any benefit under the will; but the proof of estrangement was clear and distinct. The testator was shown to have been a man of a low grade of intellect. In reference to the kind of evidence necessary to support the will, Baron Parke says: "It cannot be necessary that in all such cases, even if the testator's capacity is doubtful, the precise species of evidence of the deceased's knowledge of the will is to be in the shape of instructions for, or reading over, the instrument. They form, no doubt, *the most* satisfactory, but they are not *the only* satisfactory description of proof by which the cognizance of the contents of the will may be brought home to the deceased. The court would naturally look for such evidence. In some cases it might be impossible to establish a will without it, but it has no right in every case to require it."

Crispell *v.* Dubois.

In a more recent case, (*Darling* v. *Loveland,* 2 *Curteis,* 225,) one Petworth, who was a man of weak mind and addicted to intemperance, by his will executed in due form, gave his property, amounting to about £1800, after charging it with the payment of some small annuities, to his two executors, John Darling the landlord of a public house, and one Parker, the solicitor who drew the will. The probate of the will was opposed by Charlotte Loveland, a niece and the only next of kin of the testator. Notwithstanding the strong circumstances of suspicion attending the execution of the will, it was sustained. Sir Herbert Jenner, in delivering the judgment of the prerogative court, uses the following language—"I never understood the doctrine of this court to go beyond this, namely, that it is a circumstance which should awaken the vigilance and jealousy of the court to watch and see whether, by some means or other, a knowledge of the contents was brought home to the deceased, or *it was shown that it was the intention of the deceased to make such a disposition of his property,* which the court would accept as sufficient proof, notwithstanding that the drawer of the will took a considerable benefit under it. I do not understand that there is any technical rule, which requires proof that a will has been read to, or by, the deceased, or that it was prepared from instructions given by him. If satisfied that the instrument contains the real intentions of the testator, although there is no proof of reading over, and no proof of instructions, it will grant probate of it."

To the same effect are all the other authorities I have consulted on the question. (*See Shelford on Lunacy,* 317, *and cases there cited.*) Even the case of *Ingram* v. *Wyatt,* (1 *Haggard Ecc. R.* 384,) which was much relied upon by the counsel for the defendant upon the argument, and in which the prerogative court held that the presumptions and suspicions which attached to the transactions, and they were indeed very strong, were not sufficiently rebutted by the evidence, was subsequently reversed upon appeal to the court of delegates. Lord Chancellor Brougham refused to grant a commission of

review, on the ground that the court was satisfied that the circumstances of the case were sufficient to rebut the presumption against the will. ( *Wyatt* v. *Ingram*, 3 *Hagg. Ecc. R.* 466.)

In this case the jury, after having been sufficiently reminded of the presumptions against the validity of the will arising from the circumstances under which it was executed, have by their verdict declared that the evidence is sufficient to overcome the presumptions against the transaction. They were cautioned to look with vigilance and jealousy into the proofs, to see whether there was evidence of free and active testamentary intention on the part of the testatrix, and they have said by their verdict that the circumstances proved sufficiently manifest the intention of the testatrix to dispose of her property in the manner provided in the will; that when she executed it she knew its import and approved its contents. In view of the rules of law I have already noticed, I think the jury were warranted in finding such a verdict; and if they were, this court has no right to disturb it. The motion for a new trial must therefore be denied.

SAME TERM. *Before the same Justices.*