Rollins, S.
The instrument here in controversy was executed in April, 1880, about four years before the death of its maker, and when she was about forty years old. It undertakes to bequeath her entire estate, which consists solely of personalty, to Michael Sweeney and his sister, Catharine Gallagher, wife of Francis Gallagher. These legatees are cousins of the decedent, with whom she resided at the time this paper was executed, and with whom she continued thereafter to reside until her death. Probate is contested by others of her cousins and by her uncle; for she left her surviving no nearer relatives—no ancestors, descendants, brothers or sisters.
First—It is claimed by the contestants that on the day the disputed instrument bears date, the decedent was not possessed of testable capacity. There is no doubt that she was then suffering from disease in various forms, but the evidence neither establishes nor seriously suggests that she was physically or mentally incompetent to make testamentary disposition of her property. She had long been addicted to the use, and at times to the excessive use, of intoxicating liquors, but it does not appear that at the time when this instrument received her signature she was under the immediate influence of stimulants, or that from habits of intemperance or from any other cause, her mental or moral faculties had become so impaired that upon the day in question she was unfit to make or execute a will. Dr. Hobbie, her attending physician and one of the witnesses to the paper propounded, made his first professional call upon her about ten days before the paper was executed. He testified that he observed no indication that she had recently been tippling, and that, though he continued to see her from time to time at short intervals until her death, he never found her noticeably the worse for liquor.
Some of the witnesses for the contestants say that they often saw her drink, and some of them that she habitually drank to excess. On the other hand Julia Eagan and Michael Bowen, who were called to prove that, at a time subsequent to the date of the will, Mrs. Hatten stated to them that she had never consciously executed such a paper —both testified unequivocally that when she made these statements she was entirely sober.
Upon all the testimony I am convinced that she was quite as competent to make a will as either of the persons whose testamentary capacity was upheld in Down v. McGourkey (15 Hun, 444; aff’d 9 Wk. Dig., 5) and Peck v. Gary (27 N.Y., 9).
*215 Second—It is claimed by the contestants that the due execution of this disputed paper has not been satisfactorily established. Its attesting witnesses are Charles H. Eeed and Dr. John Hobbie, both of whom were examined and very rigorously cross-examined at the trial. I see no reason to doubt that they saw the decedent sign this instrument, that they heard her declare it to be her will, and that they severally subscribed their names at her request, and in her presence. These things, indeed, the contestants do not seriously dispute, but they insist that the execution is defective in that the evidence fails to show that the decedent knew the contents of this paper at the time she executed it as her will. If her ability to read and write were not established to my satisfaction, I should, upon the ground now under consideration, pronounce against probate. There is no proof that this instrument was prepared in pursuance of her instructions, or that it was read to her on the occasion of its execution. It is by no means clear that she then read it herself. One of the subscribing witnesses thinks that she did; the other is of the opinion that she did not. It does not definitely appear when or by whom the instrument was prepared for execution. Gallagher says that decedent told him it was drawn by a lawyer named Morrow, and Gallagher thinks that Morrow is now dead. Dr. Hobbie testifies that he first saw the will in the possession of Michael Sweeney, one of the legatees, and that this was just before it was handed to the decedent and signed by her. Nothing seems to have been' said to her at that time respecting its provisions, ■ nor is it shown that she said anything indicating her knowledge of its contents. Gallagher declares that two years after its execution he saw it in the hands of Mrs. Hatten, and heard her read portions of it to his wife. He also declares that shortly before its execution the decedent told him that she purposed to leave all her property to his wife and his wife’s brother. The contestants claim that Gallagher’s testimony is not worthy of credit, and that its untrustworthiness is especially shown by the discrepancies between the version which he gives of an incident that took place at the law office of Alfred Matthews, in October, 1882, and the version of the same incident given by a clerk to Mr. Matthews, who is, I doubt not, a disinterested witness. It seems that Gallagher and Mrs. Hatton called at Mr. Matthews’ office, and obtained and took away a written instrument which Mr. Matthews had, at some time not disclosed by the evidence, drawn for Mrs. Hatten, which the latter had executed as her will, and which she had then entrusted to Mr. Matthews for safe keeping. Gallagher was examined at great length as to the circumstances which surrounded the removal and the sub *216 sequent destruction of that paper. Miller was afterwards, called by the contestants, and gave an account of the affair, which in some of its details varied from. Gallagher’s, but which did not in my judgment, vary to such an extent as to compel the belief that Gallagher willfully swore falsely in testifying to what took place at Mr. Matthews’ office, or to justify the disregard of his positive assertion that in the-year 1882 he heard Mrs. Hatten read aloud the paper here offered for probate, and that he was advised by her prior to-its execution that his wife and his brother-in-law were tobe the sole beneficiaries of her bounty. Miller’s testimony shows very clearly that the decedent made and executed at, least one will besides that which is here in controversy. This weakens the effect of the testimony of two other witnesses called by the contestants, who swore that Mrs. Hat-ten, not long before her death, disclaimed, in their hearing,, not only any knowledge of having made a will in favor of the Sweeneys, but any knowledge of having made a will at all. I attach little importance to that testimony. There is not the slightest doubt in my mind that the decedent put her name to this paper on the day it bears date, and, all in all, I am persuaded that when she did so, she understood the nature and consequences of her act. Gallagher’s testimony that she could read and write is fully confirmed by Julia Eagan, a witness for the contestants, who. describes her as a woman of “pretty fair ” education and intelligence. Dr. Hobbie calls her sensible and clear headed. It may fairly be presumed, under these circumstances, that at the time she executed this paper she was cognizant of its contents ; and this presumption is not overthrown by the evidence upon which the contestants rely. It would be much more satisfactory if there were proof of instructions; or of an actual reading of the will to or by the testatrix, but that such evidence is not indispensable, see Crispell v. Dubois (4 Barb., 393); Billinghurst v. Vickers (1 Phill., 187); Watterson v. Watterson (1 Head [Tenn.], 1); Barry v. Butlin (1 Curteis, 637); Durling v. Loveland (2 Curteis, 223).
Said Sir Herbert Jenner in the case last cited: “It, never has been the doctrine of this court that it is necessary in all cases to prove that a will was read over to the' deceased, or that it was drawn from instructions given by him. I never understood the doctrine to go beyond this— namely, it is a circumstance which should awaken the vigilance and jealousy of the court to watch and see whether by some means or other a knowledge of the contents was. brought home to the deceased, or it was shown that it was. the intention of the deceased to make such a disposition of his," property, which the court would accept as sufficient proof, notwithstanding that the drawer of the will took a consid *217 erable benefit under it. I do not apprehend that there is any technical rule which requires proof that a will has been read by or to the deceased, or that it was prepared from instructions given by him. ”
This I understand to be a sound exposition of the law upon this subject. The instrument here in question is written in a very plain hand and is all upon one page. It can easily be read in half a minute. It contains two provisions, only one of which is dispositive, and by that one, which occupies less than nine lines, the entire estate of the decedent is given to her cousins Michael Sweeney and Catharine Gallagher. Unless the subscribing witnesses are to be altogether discredited, and I see no good reason for distrusting them, it may well have been that in the very act of subscribing her name, the decedent read this instrument from beginning to end. I have no hesitation therefore in holding that the factum of the will is duly established.
Third. The claim of the contestants that the making and execution of this paper were procured by the undue influence of its benficiaries is not sustained by the evidence. That Sweeney, one of the legatees, and Gallagher, the husband of the other, were present on the occasion of the execution, and assiduous in bringing it about, is beyond dispute. Gallagher himself testifies that he suggested who should be the subscribing witnesses, and that he summoned to decedent’s bedside the persons who acted in that capacity. As has been stated already, it was Sweeney, according to Dr. Hobble’s testimony, from whose hands Mrs. Hatten obtained the will just before she put her name to it; but these circumstances are not of themselves sufficient to invalidate the will. They have led me to scrutinize closely the evidence that concerns the decedent’s capacity, her appreciation of the character and effect of her acts, and. the reasonableness of the disposition which she is claimed to have made of her estate. The only evidence before me as-to the contents of the will which was drawn for her by Mr. Matthews, is that of Gallagher, who says that it bequeathed all her property to purposes of charity. Now, it is clear that for the last six or seven years of her life she was much more intimate with the Sweeneys and Gallagher than with any others of her relatives. It does not appear that between the time when she made the first will and the day of her death there was any change in the relations which she sustained to other relatives that would have led her to accord them a higher place in her affections and regard than they had formerly occupied. On the other hand, her intimacy with those whom she has named as her legatees was- *218 maintained for years, both before and after the execution of the paper in controversy.
I confess that the testimony which is claimed to have established the exercise of undue influence over the decedent has not greatly impressed me. Certain witnesses tell of their more or less familiar acquaintance with her prior to the time she commenced to live with Mrs. Gallagher, and of the discouragements which they encountered when they subsequently sought to visit her. Whenever they met her on the street she was accompanied, they say, by Mrs. Gallagher, who seemed anxious to prevent any communication between the decedent and her former friends and associates. Other witnesses called by the contestants testified that they often saw Mrs. Hatten alone in the streets, and one of them said that on numerous occasions she encountered her alone at church. In the years that elapsed between the date of this will and that of decedent’s death there must have been abundant opportunity to have made a testamentary disposition in harmony with her wishes, if her wishes had not been already embodied in the papers here propounded. ‘
I pronounce for its probate.