(25 Misc. Rep. 556.)

## SCHINOTTI v. CUDDY.

(Supreme Court, Special Term, New York County. December 21, 1898.)

1. ASSIGNMENT — COMPETENCY OF ASSIGNOR — UNDUE INFLUENCE—BURDEN OF PROOF.
   Where a person, 72 years old, a few days before her death assigns all her property to the person with whom she is living, to the exclusion of her relatives, and the assignee prepared the assignment, and assisted the assignor in signing it, the burden is on the assignee to show competency and freedom from undue influence.

2. SAME—EVIDENCE.

    A person 72 years old, and confined to her bed, a few days before her death assigned all her property to the person with whom she was lodging, to the exclusion of her relatives, with whom she was on good terms. The only persons present at the time were the assignee and her husband, the former holding the assignor up, and guiding her hand in signing the paper, which had been prepared by the husband. A notary called the next day to take her acknowledgment, and when he asked if it was her voluntary act she made no reply, and he refused, under the circumstances, to execute the acknowledgment. *Held* insufficient to sustain the burden of proving that the assignor was competent.

3. SAME.

    The evidence was also insufficient to show that there was no undue influence.

    Action by Annie Schinotti, as administratrix of the estate of Isabella Geddes, against Mary Cuddy. Judgment for plaintiff.

    Wheeler H. Peckham and Lewis & Stoddart, for plaintiff.

    Ezekiel Fixman and John C. Robinson, for defendant.

    DALY, J. This action is brought to set aside an assignment of four bonds and mortgages, aggregating in value $11,750, alleged to have been executed by Isabella Geddes on October 15, 1897, two weeks before her death, to the defendant, Mrs. Cuddy, with whom and whose husband she had been a lodger and boarder for about seven years. The plaintiff, Annie Schinotti, and her sister, are nieces and the only next of kin of Miss Geddes, whose whole property, with some trifling exceptions, was conveyed by the assignment in question. The assignment is attacked on the ground that Miss Geddes was mentally incompetent to make it, and that it was procured by fraud or undue influence, and that it was, in fact, not executed by her. Miss Geddes was a maiden lady, 72 years old, and, up to May 1, 1890, had resided with her sister, Mrs. Samuels, who carried on the business of keeping boarders. The nieces resided with their aunts until the latter concluded to give up the house, which the nieces then hired. Some negotiations were had looking to the hiring of the furniture, also, which belonged to Miss Geddes; but those negotiations fell through, and it was put up at auction and sold upon the premises. On or about the last-named date, Miss Geddes went to Mr. Cuddy, the defendant's husband, who was manager of a tea store in the neighborhood, where she had dealt for some years, and complained to him that she had been turned out by her nieces, and was in search of a place to live. He took her at once into his own house, and she and her sister lived there until the death of the latter, which occurred about a year afterwards, Miss Geddes thereafter continuing to remain with Mr. and Mrs. Cuddy until her death, in 1897. She hired the second floor, and had her meals, paying a weekly sum therefor. The nieces visited Miss Geddes for the first time at the time of Mrs. Samuels' death, but afterwards more frequently. It is claimed on the part of the defendant that Miss Geddes cherished such resentment against them for the ill treatment of which she complained, as above mentioned, as to fully account for her conveying all her property away from them, and giving it to a stranger in blood; but, on the other hand, there is evidence that she had no real cause of complaint against

them, and that she subsequently spoke of them with affection to two intimate friends, Mrs. and Miss Hatton, and to her pastor, the Reverend Dr. Hull, who were in the habit of making her frequent visits. Miss Geddes fell ill about a year before her death, and towards the end became affected mentally to some extent, and during her illness Mrs. Cuddy acted as her nurse and attendant, and was required to be very much about her, and to render her many services and attentions. The assignment of the bonds and mortgages in question was prepared by Mr. Cuddy, and was executed by Miss Geddes in bed, the only person present at the time being Mr. and Mrs. Cuddy and their servant maid. According to Mr. Cuddy's testimony, Miss Geddes asked him in August or September, 1897, to prepare this assignment, in order that she might be rid of the importunities of her nieces, her pastor, Mr. Hull, and her intimate friends, Mrs. and Miss Hatton, who were urging her to make a will, "sometimes in favor of some parties, and again in favor of other parties." Mr. Cuddy had the paper prepared, and gave it to her the first week of October. She kept it until the night of the 15th, when she said to him: "Mr. Cuddy, I am determined to sign the paper. I want to give these bonds and mortgages to Mrs. Cuddy, and I want her satisfied." He advised her to wait until the morning, but she insisted, and asked for pen and ink, which he placed on her bed with a book to write upon. She made two attempts to write her name, and failed, and then asked Mrs. Cuddy to assist her. Mrs. Cuddy advised her to wait until next day, but Miss Geddes insisted, and Mr. Cuddy told Mrs. Cuddy to assist her. Mrs. Cuddy then leaned over on the bed and took Miss Geddes' hand in hers, while Miss Geddes held the pen, and wrote the name as it is found on the paper. Miss Geddes then handed him the paper, and asked him to sign it. He took it downstairs and signed his name, "In presence of Michael J. Cuddy," filled in the date, and returned the paper to Miss Geddes, who said she would keep it for a little while longer, and read it again. Two days afterwards—on the 17th—she delivered it to him, and told him to go and get the mortgages from her drawer; she wanted him to have them, and said that she was glad it was all over, and she would have some peace of mind now. On the 19th he took the assignment to his lawyer and made proof of its execution before a notary. His lawyer advised him to have it re-executed by Miss Geddes, and had a duplicate prepared, without signature, for that purpose. Mr. Cuddy called upon Mr. Everett, a notary, with whom he was well acquainted, and explained what was wanted, and on the 25th of October the notary came to the house, and was brought to the bedside of Miss Geddes. Mr. Cuddy's version of what occurred is that the notary asked Miss Geddes, "Are you willing to leave these mortgages to Mrs. Cuddy?" and that she made no answer, but that it was because the notary did not give her time, but hurried on, and said he would not perfect the papers; that, under the circumstances, he was afraid to do so; that it might get him into trouble. The notary's version of what occurred is that when he asked Miss Geddes, "For the consideration of one dollar do you want to assign these mortgages to Mrs. Cuddy?" and, after reading the different mortgages and the paper to her, Miss Geddes lifted up out of the bed, and

shook her head, and moaned; that he asked her three times, and got no different answer, and that he then told Mr. and Mrs. Cuddy, who were both present all the time, that he would not take the acknowledgment, whereupon Mr. Cuddy told him to "get out; he would get some other notary on the avenue to do it"; that Mrs. Cuddy followed him, and got his hat, and let him out, and said that she did not know anything about this; and when he told her that her name was embodied in the assignment, she said that she did not know anything about it, that everything that was done was by her husband. Miss Geddes' death took place four days after this occurrence.

It is manifest from the mere statement of these leading facts that a paper of so much importance as this assignment, executed under such circumstances, should not be sustained, except upon satisfactory proof that the assignor comprehended and intended her act; the burden of proving her competency and freedom from undue influence resting, under the peculiar circumstances of the case, upon the party claiming under the instrument, and by whose direct act its execution was effected. The law applicable to the case does not differ in essentials from that concerning the execution of wills. "By the civil law a will drawn by the legatee would be absolutely void. '"Qui se scripserit hæredem" rendered void all the provision in a will in his own favor.' Crispell v. Dubois, 4 Barb. 398; Delafield v. Parish, 25 N. Y. 35. The courts in England and in this country have not gone the length of the civil law, and held such wills absolutely void. Yet the better rule to be deduced from the adjudged cases is that a presumption of undue influence should be indulged against them when the testator is feeble, weak, and in advanced old age." Marvin v. Marvin (Ct. App.) note to 3 Hun, 140. "Where the person who prepares the instrument and conducts the execution of it is himself an interested person, his conduct must be watched as that of an interested person. Propriety and delicacy would infer that he should not conduct the transaction." Paske v. Ollat, 2 Phillim. 323, quoted in Crispell v. Dubois, 4 Barb. 393–398. "Whenever a man takes a voluntary donation, he must assume the burden of proving the transaction righteous; that is, of showing that the donor understood what he was doing." Weller v. Weller, 44 Hun, 172–178, citing Hoghton v. Hoghton, 11 Eng. Law & Eq. 134, and Gibson v. Jeyes, 6 Ves. 266.

The defendant Mrs. Cuddy, who claims practically all the property of the deceased under the assignment in question, plainly comes within the settled rules above enunciated. She took a more important part than the simple preparing of the assignment; she practically executed it herself by holding the passive fingers of Miss Geddes in her own, and writing the signature, which, as it appears upon the paper, indicates no volition on the part of the assignor. Mrs. Cuddy was dealing with an elderly woman, enfeebled by long illness, and on her deathbed, who had been her lodger and boarder for years, and constantly in her company, and to whom she also held the position of nurse. She was procuring a voluntary conveyance to herself of what she must have known to be all the property of her patient, friend, and boarder, to the exclusion of known kindred.

Under the circumstances, the burden is undoubtedly cast upon her to establish to the satisfaction of a court of justice that the paper was executed by a person capable of comprehending her act, and doing it of her own free will. The chief point to establish, in order to show competency and free will, would be that the assignment by which Miss Geddes so conveyed all her property was made in accordance with reason, or according to some fixed judgment or settled purpose of her own. Delafield v. Parish, 25 N. Y. 25, quoting Shropshire v. Reno, 5 J. J. Marsh. 91. According to her physician's testimony, Miss Geddes was dull mentally during her illness, but was able to answer his questions intelligently up to two or three days before her death, and understood perfectly what she was doing, but was not capable of any continued mental effort. She was about in the same mental condition at the time of the alleged execution of the paper, and at the time of the alleged delivery of it two days afterwards, and at the time of the notary's visit, eight days afterwards, when the attempt was made to get her to re-execute it. If she had had any intention, or been capable of forming the intention, of disposing of her property to Mrs. Cuddy at any of these times, she would have been able to express it when asked in a solemn manner by the notary if she intended to make such disposition. The language of the court in the case last cited is applicable to the present: "That the testator had not a disposing mind, or that, if he ever had, it was not in a disposing state. He was not superannuated, nor was he absolutely stultus or fatuus, but all the facts combined tend to show that he had not a sound memory, nor sufficient mind, nor a mind in a proper state for disposing of his estate with reason or according to any fixed judgment or settled purpose of his own." The effect of the whole testimony, taking the version of Mr. Cuddy as well as that of the notary, is a failure to sustain the burden which rests upon the defendant under the circumstances of the case. The whole proof of the execution of the assignment rests in the testimony of interested persons. As soon as a disinterested witness is brought into the presence of the assignor, to ask her if it was her intention to make this disposition of her property, she either gives no sign whatever, or answers decidedly in the negative. Not only is there a failure to show any fixed judgment or settled purpose in this act of the assignor, but it is directly contrary to reason. While lying ill in bed, an aged and helpless invalid strips herself of all she possesses, and leaves herself to the charity of her donee. What person capable of forming a judgment as to the import and consequences of the act would have signed such a paper? Had she simply executed a will in Mrs. Cuddy's favor, making a disposition of her property which could only take effect upon her death, the reasonableness, if not the propriety, of the act, might have been argued. But there is nothing plausible to be advanced in support of this alleged act. Even if it were proved that there was a settled purpose, with due comprehension of its meaning, on the part of Miss Geddes to make such a gift as this to Mrs. Cuddy, the latter and her husband ought to have instinctively refrained from any active participation in it, and should have called in disinter-

ested persons to carry out any such intention. That the contrary course was pursued, even to the extent of physical control in the signing of the paper, tends to support the charge that this instrument was not the act of Miss Geddes; and the whole evidence on the part of the defendant fails to overcome the presumption against the validity of the paper under which she claims.

Judgment must be for plaintiff, with costs. A short form of decision may be prepared, embodying the contents of plaintiff's requests to find.